Gordon E. VAN LIEW, Dell Van Liew, Arthur R. Becker, Verne C. Madison, Appellants,

v.

UNITED STATES of America, Appellee.

No. 19000.

United States Court of Appeals Fifth Circuit.

Aug. 5, 1963.

J. Edwin Smith, A. F. Thomson, William F. Walsh, Percy Foreman, Houston, Tex., for Gordon E. Van Liew, and others; Smith & Lehmann, Foreman & Walsh, Houston, Tex., Sharpe & Hardy, Brownsville, Tex., of counsel.

William B. Butler, Robert C. Maley, Jr., Scott T. Cook, Asst. U. S. Attys., Houston, Tex., Woodrow Seals, U. S. Atty., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Our disposition of this appeal makes it necessary for us to consider only one question presented here by Defendants. That question is whether the indictment states an offense against the United States. The Defendants were tried and convicted under a six-count indictment. Count I charged them with conspiring to introduce into interstate commerce adulterated and misbranded food.[1] Counts II through VI charged the substantive offenses of introducing into interstate commerce foods which were *adulterated* or were *misbranded*.[2] We conclude that the Defendants were prosecuted under the authority of a faulty indictment. The convictions are accordingly reversed and the cause remanded.

It is essential to bear in mind that this is a prosecution for *economic* misbranding or *economic* adulteration. In the sale of its products through the channels of established, reputable, re-

---

1. Count I of the indictment charged a violation of 18 U.S.C.A. § 371 in that the Defendants "did unlawfully, knowingly, * * * conspire * * * to * * * introduce into interstate commerce * * * with intent to defraud and mislead, a food which was *adulterated* within the meaning of * * *" 21 U.S.C.A. §§ 342(b) (2) and 342(b) (4) "in violation of" 21 U.S.C.A. §§ 331(a), 333 (b) and "to introduce into interstate commerce * * * with intent to defraud and mislead, a food which was *misbranded* within the meaning of" 21 U.S.C.A. §§ 343(a), 343(b), 343(i) (2) "in violation of" 21 U.S.C.A. §§ 331(a), 333 (b). In five numbered subparagraphs (I through V), the indictment then charged that this "unlawful conspiracy" was substantially "that Defendants * * * would produce a food represented to be pure orange juice, but which in truth and in fact the Defendants would misbrand and adulterate by adding to orange juice, sugar, water, and other ingredients." Then follows a list of 17 numbered items covering such things as the names and corporate capacity of the various Defendants, where the orange commodity was made, the states to which it was shipped, and several incidents in which Defendants had bought sugar, corn syrup, frozen orange juice concentrate, ascorbic acid, etc. This was followed by a list of 12 numbered overt acts.

2. The substantive counts were in two groups.

Counts II, III and V charged shipments which were adulterated. Count II is typical. It charged "that on or about February 21, 1959 * * * [Defendants] with intent to defraud and mislead, did introduce * * * into interstate commerce from Houston, Texas, to Columbia, Missouri, a quantity of food * * * represented to be pure fresh orange juice, which food was adulterated within the meaning of" 21 U.S.C.A. § 342 (b) (2) and (4) "in violation of" 21 U.S.C.A. §§ 331(a), 333(b).

Counts IV and VI charged shipments which were misbranded. Count IV is typical. It charged "that on or about March 2, 1959 * * * [Defendants] with intent to defraud and mislead, did introduce * * * into interstate commerce from Houston, Texas, to New Orleans, Louisiana, a quantity of food * * * represented to be pure fresh orange juice, which food was misbranded within the meaning of" 21 U.S.C.A. § 343 (a), (b), and (i) (2) "in violation of" 21 U.S.C.A. §§ 331(a), 333(b).

liable dairies and the like, there is not the slightest suggestion that Defendants' commodity was unwholesome. On the contrary, the Government conceded that "there is nothing wrong with their product, not a thing in the world," and that it "is just as good and just as palatable and has as many vitamins as freshly squeezed" orange juice. It stipulated that the Defendants' commodity was produced in "a clean, modern, sanitary plant." The Court so recognized in its charge [3] and while not immediately connected with our disposition, the jury under alternative verdict forms held that the violations were committed by Defendants "without intent to defraud or mislead."

Since we do not reach the question of the sufficiency of the evidence to support the convictions, it is unnecessary to give a detailed statement of the facts. However, they briefly consist of these. Cal-Tex Citrus Juice, Inc. engaged in the business of making an orange drink. The product was composed of freshly squeezed orange juice, concentrated orange juice, water, sugar, and at times glucose and ascorbic acid. The product ordinarily contained these ingredients, and rarely was composed entirely of juice as it comes from an orange. The drink was produced in the Cal-Tex plant in Houston, Texas and shipped to points in Louisiana, Kansas, Missouri, and other states.

The Defendants used three corporations in their business of producing and distributing this orange drink. Each of the Defendants served in some capacity as officers and directors of each of these three corporations. Cal-Tex was the corporate entity which actually produced the drink. Transportation Leasing, Inc. was used by Defendants to own all of the rolling stock used in the production and delivery of the drink, as well as being used for the purchase and delivery of sugar, frozen concentrate, Vitamin C, and glucose used in the production. Central States Processors, Inc. was another corporation which served as the distributor of the orange drink.

To the indictment (see notes 1, 2 supra), Defendants filed a "Motion Raising Defenses and Objections" [4] plus a motion in arrest of judgment, F.R.Crim. P. 34, which asserted that the indictment did not state facts sufficient to state a criminal offense. The motions pointed out with great particularity the failure of the indictment to allege facts and circumstances regarding misbranding and adulteration. Overruling these motions, the District Court necessarily held the indictment sufficient.

The guidelines for determining the sufficiency of an indictment have been established for so many years that they are no longer open to question. We do not think it would be helpful to set out the many ways in which the rules have been stated. The rule as stated in 1833 was that "in all cases, the offence must be set forth with clearness, and all necessary certainty, to apprise the accused of the crime with which he stands charged." United States v. Mills, 1833, 7 Pet. 138, 32 U.S. 138, 142, 8 L.Ed. 636. Recently, the criteria were reiterated with emphasis in Russell v. United States, 1962, 369 U.S. 749, 763, 82 S.Ct. 1038, 1046, 8

---

3. "It is not disputed that the defendants' plant was sanitary and clean * * * [or that] * * * their product was wholesome and tasty, and apparently very popular, and had received wide public acceptance * * *."

4. The Defendants' motion contended, in part, that "the indictment wholly fails to meet the requirements of Criminal Rule 7(c) in that the indictment, and each count thereof, fails to contain a plain,

concise and definite written statement of the essential facts constituting the offense charged. The indictment, and each count thereof, rather than alleging a statement of the essential facts constituting the offense charged, alleges only opinions and conclusions. Consequently, the indictment, and each count thereof is too vague and indefinite, and does not sufficiently advise the defendants of the offenses with which they are charged so as to enable them to properly prepare their defense."

L.Ed.2d 240: "These criteria are, first, whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet," ' and, secondly, ' "in case any other proceedings are taken against him for a similar offence, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." ' [citing cases]." We have given recent, and decisive, recognition to these principles in Beitel v. United States, 5 Cir., 1962, 306 F.2d 665.

These judicial principles have descended from the Constitution which declares that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury * * * nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; * * *", and that "In all criminal prosecutions, the accused shall enjoy the right * * * to be informed of the nature and cause of the accusation; * * *." U. S. Constitution, Amends. V, VI. Responding to these basic demands, F.R.Crim.P. 7(c) provides that "The indictment * * * shall be a plain, concise and definite written statement of the essential facts constituting the offense charged."

■■■ Important as are the two most emphasized criteria—(1) notice and (2) double jeopardy—the presentment by a Grand Jury has in our constitutional scheme another basic function. It is the protection to the citizen against unfounded charges. Little may be left open to construction or interpretation of an indictment. If the offense is not plainly stated and is made so only by a process of interpretation, there is no assurance that the Grand Jury would have charged such an offense. The Supreme Court has made this vividly clear in Smith v. United States, 1959, 360 U.S. 1, 9, 79 S.Ct. 991, 996, 3 L.Ed.2d 1041. "The Fifth Amendment made the [common law rule requiring indictments] mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings." And even more recently it has been emphasized in Russell. "To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury was designed to secure. For a defendant could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." 369 U.S. 749, 770, 82 S.Ct. 1038, 1050. It was just such principles which led us to confine tolling exceptions to indictments as such, not informations tentatively in lieu of indictments. Hattaway v. United States, 5 Cir., 1962, 304 F.2d 5, 12.

■ The first count of the indictment here charged the Defendants with a conspiracy to violate the laws of the United States (note 1, supra), 18 U.S.C.A. § 371. The attack made on this Count is that it does not state an offense. With this, we are in basic agreement. The indictment alleges the conspiracy in typical terms in that the Defendants "did unlawfully, knowingly, * * * conspire, confederate, and agree together * * *" to violate laws of the United States. This Count also alleges the manner in which the Defendants worked together, e. g., they were interrelated officers and directors of the various corporations, etc. We may assume that this Count adequately charges the existence of the conspiracy, i. e., agreement, and also some of the means or overt acts by which it was being carried out. But the fault with Count I lies, not in the conspiracy element, but in its failure to meet the standards described above in setting out the manner by which the specified federal laws have been violated.

Paragraphs 1 and 2 of Count I allege that in furtherance of the conspiracy, the Defendants introduced into interstate commerce a food "which was adulterated

within the meaning of" 21 U.S.C.A. § 342(b) (2) and (4). These sections state that a food is adulterated "(2) if any substance has been substituted wholly or in part therefor * * * or (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is." [5]

Paragraphs 3, 4, and 5 of Count I alleged that the Defendants conspired to introduce into interstate commerce a food "which was misbranded within the meaning of" 21 U.S.C.A. § 343(a), (b), (i) (2).[6]

At the outset we think it appropriate to point out that the Government's response to this contention confuses the Defendants' constitutional right to know what *offense* is charged with his need to know the *evidentiary details* establishing the facts of such offense. As to the latter, the remedy lies in the Motion for Bill of Particulars, F.R.Crim.P. 7(f).

Here the conspiracy indictment as to adulteration essentially charges only that Defendants "would produce a food represented to be pure orange juice, but which in truth and in fact the defendants would misbrand and adulterate by adding to orange juice, sugar, water, and other ingredients." [7]

■ But this is not a federal crime unless it contravenes a statute.[8] The statute specified was § 342(b) (2) and (4). But this charges a variety of unknown actions. Thus, under subparagraph (2) it is adulterated "if any substance has been substituted wholly or in part *therefor*" (emphasis added). "Therefor" for what? Subparagraph (2) does not make sense without subparagraph (1) as an antecedent. But subparagraph (1) deals with the omission or abstraction in whole or in part of "any valuable constituent."

■■ For there to be a crime under (2), there must be the *substitution* of "any substance" for some "valuable constituent" of the food. Unless there is a "valuable constituent" plus a substitution of "any substance" for it, there is simply no crime. But the trial Court cannot guess, and the Defendants may not constitutionally be compelled to guess, what it was (if anything) the Grand Jury had in mind. With the infinite variety of foods now manufactured and processed, the indictment must specify what the "valuable constituent" is and then

5. 21 U.S.C.A. § 342.
 "A food shall be deemed to be adulterated—
 * * * * *
 "(b) (1) If any valuable constituent has been in whole or in part omitted or abstracted therefrom; or (2) if any substance has been substituted wholly or in part therefor; or (3) if damage or inferiority has been concealed in any manner; or (4) if any substance has been added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is."

6. 21 U.S.C.A. § 343.
 "A food shall be deemed to be misbranded—
 "(a) If its labeling is false or misleading in any particular.
 "(b) If it is offered for sale under the name of another food."
 If it is a food for which there is no standard of identity prescribed by Regulation, it shall be deemed misbranded unless its label bears the common or usual name of the food, and in instances where the commodity "(i) (2) * * * is fabricated from two or more ingredients, the common or usual name of each such ingredient; except [that spices, flavorings or colorings need not be specifically designated by name] * * *."

7. The 17 items which followed this allegation, see note 1, supra, added nothing since each referred merely to "*such* adulterated and misbranded food." Neither did the 12 overt acts.

8. "There is no evidence to indicate a legislative intent to bar from the market foods which are wholesome merely because they may in fact be of relatively little value. So long as they are not confused, with more wholesome products, their presence does no harm." United States v. 88 Cases, 3 Cir., 1951, 187 F.2d 967, 972.

charge what "substance has been substituted * * * therefor."

Neither in the conspiracy count nor the substantive counts (note 2, supra) is there even the vaguest hint as to what the "valuable constituent" is or even that the Defendants "by adding to orange juice, sugar, water, and other ingredients" were making a substitution "therefor."

The deficiency is even more startling as to § 342(b) (4). There are at least three different kinds of adulterations resulting from "any substance" that "has been added * * * mixed or packed therewith." The first is when the effect is "to increase its bulk or weight." Second, when it is to "reduce its quality or strength." The third when it is to "make it appear better or of greater value than it is."

Just what was it the Grand Jury thought these Defendants had done? Increased weight? Its bulk? Reduced its quality? Its strength? Or made it appear better or greater? Better or greater than what?[9]

■ Under subparagraph (2) incorporating necessarily subparagraph (1) and the introductory alternatives of subparagraph (4) with its still further alternative acts, there is a minimum of eleven possible crimes. Did the Grand Jury intend to charge all eleven? Must the Defendants guess what ones were intended, thereby putting on the Defendants the

9. In argument as to the third point (no ascertainable criterion of guilt in absence of promulgation of administrative standards of identity), the Defendants' brief develops the many mysteries enshrouded in the words of subparagraph (4) *barring* specific factual allegations:

"Now some pertinent inquiries: What is 'better than it is?' What is 'of greater value than it is?' What is the standard of 'its quality?' By what do you determine 'its strength'? What is the norm for bulk and for weight? *Without Standards of Indentity how is it possible to know?*

"Apply similar questions to the Orange Juice Industry: What is 'orange juice'? What is the norm for Brix acid ratio (Soluble solids to acid) for standard orange juice? Is reconstituted orange juice 'orange juice'? Is blended orange juice 'orange juice'? Is homogenized orange juice 'orange juice'? Is pasteurized orange juice 'orange juice'? Is the mixing of orange juice reconstituted from frozen orange juice concentrates with orange juice squeezed today illegal? Is the adding of the water necessary to reconstitute concentrated frozen orange juice illegal? In what proportions can the reconstituted juice be used? In what proportions must orange juice squeezed today be used? When orange juice squeezed today is too high in acid content for a proper standard of flavor can concentrates frozen last autumn from sweeter fruits be blended to maintain the necessary standard for taste? In the process of blending juices are you reducing the quality of one type of juice and making another appear better than it is? In blending when are you increasing bulk and weight and when are you not? *Without Standards of Indentity how is it possible to know!*

"Further: To whom must the food 'appear better or of greater value than it is?' Is it the consumer or the Government Inspector? If the consumer, is it the discerning consumer, the indifferent consumer, or the average consumer? If the average consumer, is it the average consumer in the Texas Valley, in the Panhandle, in Missouri, Louisiana, or Kalamazoo? Assume sales to all such areas, must the product meet the differing viewpoints of average consumers in different areas, if not, which controls? Who is to determine in advance, and how, the decision of the 'average consumer' in any of such places? *Without Standards ards of Identity how is it possible to know!*"

Judge Hastie, perhaps in more restrained language, undergoes similar judicial travail.

"In the context of the present case, it is our conclusion that the language of Section 402(b) (4) covers a situation in which the challenged process of manufacture was the inclusion of one or more designated ingredients among the primary integral components of a distinct fabricated article. It is not important whether the final product has been achieved by a direct dilution of orange juice or, as here, by a more complex process of fabrication.

"More difficult questions arise in construing and applying in the requirement of the statute that admixture shall have made the food 'appear better than it is.' To whom must the food 'appear better than it is'? And how is it to be deter-

burden of developing evidentiary detail as to all? To the extent that the queries can be answered by response to a Bill of Particulars, the Defendants may not in fact have been deprived of the right to know what proof they would have to meet. But this is only part of it. For the District Attorney is not the Grand Jury, and he may not determine what it is that the Grand Jury has charged. If the choice of one or more out of many unidentified crimes may be made by the prosecutor, then presentment by a Grand Jury will have become a useless, historic ritual.[10]

▇▇▇ What has been said as to "adulteration" requires a reversal of the conspiracy count regardless of its sufficiency as to "misbranding." The guilty verdict

mined whether the food 'appears better than it is'?

\* \* \* \* \*

"\* \* \* Thus, in the case before us, proof of violation of the statute requires first description and definition of the superior counterpart, and second, proof that the consumer is likely to mistake the inferior for the superior.

\* \* \* \* \*

"\* \* \* It makes little sense to speak of concealment of inferiority except when we add to *what*. (Emphasis the Court's.) It makes equally little sense to speak of misleading enhancement of appearance except in relation to some standard which by some reasonable technique has been made relevant.

\* \* \* \* \*

"\* \* \* Again, the conclusion on adulteration is rested squarely on the deception potential of the product sold in relation to a familiar standard.

\* \* \* \* \*

"Legislative consideration of the problem of standards under the Act gives further support to our conclusion that Section 402(b) (4) is not applicable if the allegedly adulterated food is its own only standard. The inability of the government to establish enforcible standards for fabricated foods, considerably hampered the work of enforcement of 1906 Act. The solution to this problem suggested in the course of legislative consideration of the 1938 bill, and in due course adopted, was the enactment of provisions giving the Secretary of Agriculture power to promulgate standards of identity for foods. Such standards were to be imposed only after full and fair hearing.

was general. With inquiry forever foreclosed, it is just as likely that the verdict was based on the *insufficient* charge of adulteration as on misbranding. Consequently, we do not need to determine whether the conspiracy count adequately charges as an object thereof the separate offense of misbranding. § 343(a), (b), and (i) (2).

But we do have to face the problem in relation to the substantive counts IV and VI (note 2, supra). Except to identify the time, places and quantity of a shipment of "\* \* \* food represented to be pure fresh orange juice," the indictment merely charges in the words of the statute that "such food was misbranded within the meaning of" § 343 (a), (b), and (i) (2).

"Questions of various permissible degrees of dilution which were regarded below as relevant and in issue are peculiarly appropriate for disposition by this administrative technique. Under the required administrative procedure, the whole industry can participate in the determination whether orange-flavored soft drinks are capable of satisfactory definition, how their composition should be restricted, and even whether such a food as orange drink, or any of its variants, should be permitted in commerce. Cf. Federal Security Administrator v. Quaker Oats Co. [318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. 724] supra.

\* \* \* \* \*

"\* \* \* But as already indicated, we think the procedure used here permits condemnation only where there is confusion with a defined superior product. *If the government would go further it must undertake the formulation of standards of identity in this area.*" (Emphasis supplied) United States v. 88 Cases, 3 Cir., 1951, 187 F.2d 967, 971.

As emphasizing his remarks, Judge Hastie pointed to the legislative history of a former act (footnote 4):

"These provisions [of the Act] in themselves imply the existence of definitions and standards of identity, since no one can tell when an article is adulterated under them without first determining definitely what constitutes the unadulterated product."

10. For the reasons discussed above, Counts II, III, and V (note 2, supra) are also defective in charging the substantive offense of adulteration.

While the structure of § 343(a), (b) (see note 6, supra) is not so complex as § 342, its relation to the balance of the Act makes a charge merely in statutory terms inadequate. A food [11] is misbranded if the label is "(a) * * * false or misleading in any particular," or the item is "(b) * * * offered for sale under the name of another food."

We might assume that "false" carries its usual meaning. But "misleading" has its own peculiar statutory meaning.[12] The statute envisages therefore that there might be a misleading label without it being false and vice versa. What is claimed here? That the label was false *or* misleading? Misleading, but not false? Misleading *and* false? False, but not misleading? And if misleading, in what way does the particular shipment come within the statutory definition of that term? (See note 12, supra).

It should be noted that in the substantive counts there is not even a single word about the addition of sugar, water, etc. Nor is there the slightest hint as to what made the label as to the product "represented to be pure fresh orange juice" misleading or false.

The shortcomings are even more flagrant as to misbranding from the item being "(b) * * * offered for sale under the name of another food." That charge involves at least two elements. The first is the real name of the food sold. Second is the name of the *other* food. What was the name of the food as shipped here? What was the name of the other food? It only gets worse when we look at the *conjunctive* charge of misbranding under (i) (2).

First, that automatically brings into play § 343(g). More important, it requires that for an item not having a subparagraph (g) standard of identity, the label must show "(1) the common or usual name of the food, if any there be * * *." Did this "food" as shipped have a common name? If so, what was it? Or was it nameless under the phrase "if any there be" ? While subparagraph (1) was not specifically alleged, it relates directly to subparagraph (2). Subparagraph (2) requires the usual names of ingredients if the food is "fabricated from two or more ingredients." Here there was not a single word in the substantive counts charging that the shipment was "fabricated," whatever that means. Nor was there any factual statement as to what the "ingredients" were, or what their usual names were.

Wrapped up in the easy generality "misbranded within the meaning of" § 343(a), (b), and (i) (2) were not less than six possible, but separate, offenses. Were all six intended? Or only two? Or three? Which ones? This deficiency was not cured by the bill of particulars. For it is not the office of a bill of particulars to ascertain what offense is charged.

The long and short of it is that the Defendants were not sufficiently apprised of the nature of the charges being made so that they could adequately prepare a defense. Although evidentiary detail as to a few of the missing pieces was supplied in the Government's answer to the Defendants' motion for a bill of particulars, "it is a settled rule that a bill of particulars cannot save an invalid indictment." Russell v. United

---

11. Food is defined as "(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article." 21 U.S.C.A. § 321(f).

12. 21 U.S.C.A. § 321(n): "If an article is alleged to be misbranded because the labeling is misleading, then in determining whether the labeling is misleading there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual."

States, supra, 369 U.S. at 770, 82 S.Ct. at 1050; Beitel v. United States, supra, 306 F.2d at 671. The indictment completely relied on the statutes for stating an offense. An indictment in the language of the offended statute is valid if the words of the statute "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." But if the statute is pleaded in the indictment in general terms, "it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." Russell v. United States, supra, 369 U.S. at 765, 82 S.Ct. at 1047.

 This seems especially necessary as to acts asserted to be criminal offenses under a statutory scheme as complex as this one and in which severe penalties of fine and imprisonment may be exacted even as misdemeanors when the actions taken or omitted are determined to have been done with no "intent to defraud or mislead." 21 U.S.C.A. § 333(a), (b). When, as this statute permits, innocuous and morally innocent actions may send men to jail for long periods of time because mistakes in processing or labeling, etc. result in *economic* adulteration, it is essential that the offense (or offenses) be identified and charged in terms which adequately relate the actions to the statute.[13] This in no sense implies that we require the pleading of evidence.

For the reasons discussed above, all of the Counts were defective. The judgments of conviction are reversed and the causes remanded with directions to dismiss the indictments.

Reversed and remanded.

---

13. These comments rest on the literal terms of the statute which we assume, without deciding, to be valid. In view of our disposition we intimate no view on any of the other contentions of the Defendants. Specifically, we do not reach the claim that in the absence of promulgated standards of identity, there is no lawfully ascertainable criterion of guilt even under cases such as United States v. Behrman, 1922, 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619; United States v. Balint, 1922, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604; United States v. Dotterweich, 1943, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48; and see, Standard Oil Co. of Texas v. United States, 5 Cir., 1962, 307 F.2d 120.