Gordon E. VAN LIEW, Appellant,

v.

UNITED STATES of America, Appellee.

No. 19252.

United States Court of Appeals
Fifth Circuit.

Aug. 5, 1963.

---

A. F. Thomson, J. Edwin Smith, Percy Foreman, Houston, Tex., T. Gilbert Sharpe, Brownsville, Tex., for Gordon E. Van Liew; Smith & Lehmann, Foreman & Walsh, Houston, Tex., Sharpe & Hardy, Brownsville, Tex., of counsel.

Robert C. Maley, Jr., Asst. U. S. Atty., Houston, Tex., Woodrow Seals, U. S. Atty., Scott T. Cook, Asst. U. S. Atty., for appellee.

Before TUTTLE, Chief Judge, and HUTCHESON and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

On this appeal from a judgment of conviction on two counts of perjury, the questions for our determination are whether the alleged perjured statement in one of the counts was lifted out of the context in which it was made and whether there is sufficient evidence to support the conviction on the other count. A careful scrutiny of the record convinces us that both of these questions must be answered favorably to the Defendant Gordon Van Liew, and the convictions must be reversed.

This is one phase of a triple attack by the Government concerning activities

of Defendants (and Associates) in the manufacture and sale of an orange juice product. On June 19, 1959, a hearing was held in the United States District Court on the Government's motion for a preliminary injunction. In that civil action brought for equitable relief, the Government sought a preliminary injunction restraining several named defendants from shipping a certain orange drink on the ground that in the manner sold and labeled it was economically adulterated and misbranded.[1] The Government's action was unsuccessful. The District Court declined to grant the relief, dissolved the prior restraining order and subsequently set the case for trial on its merits.[2] The Government then pursued the criminal route. On March 27, 1961, the individual defendants were placed on trial under a six count indictment charging a criminal conspiracy to misbrand and adulterate the orange drink, and the substantive counts of adulteration and misbranding also under 21 U.S.C.A. §§ 342(b) (2) and (4), 343 (a), (b), and (i) (2). On April 7, 1961, the jury returned verdicts of guilty. But as in the earlier civil proceeding, the result was not that sought by the Government since the verdicts found no intent to defraud or mislead, thus reducing the offense from a felony to a misdemeanor. By separate opinion we have this day reversed these convictions by our determination that the indictment was defective. Van Liew v. United States, 5 Cir., 1963, 321 F.2d 664.

On April 20, 1961, just shortly after the criminal trial for adulteration and misbranding, the Defendant Gordon Van Liew and two others[3] were charged under a six count indictment[4] with having committed perjury at the origi-

1. The civil complaint was brought against Cal-Tex Citrus Juice, Inc., a corporation, and Gordon E. Van Liew, Dell Van Liew, and Arthur R. Becker, and was based on alleged violations of 21 U.S.C.A. §§ 342 (b) (2) and (4), 343(a) (b), and (i) (2).

2. That trial was never had. On the Government's motion the injunction proceeding was subsequently dismissed without prejudice in February 1960.

3. Dell Van Liew, vice-president of Cal-Tex Citrus Juice, Inc., and Arthur Becker, the general and plant manager immediately in charge of production in the Houston plant.

4. Count I of the indictment charged that the Defendant Gordon Van Liew and Dell Van Liew and Arthur Becker conspired to commit perjury. This Count was dismissed by the Government prior to the trial. Count II charged Dell Van Liew with perjury by this testimony:

"Q. Mr. Van Liew, I will ask you if you yourself as officer of the corporation or individually, have any knowledge of any adding of water or sugar to your product at any time during the time that the corporation has operated?

"A. Absolutely not.

"Q. Are you operating or have you ever as far as you know during the whole time of the operation of your plant added water or sugar to your product?

"A. Absolutely not.

"Q. Have you ever heard of anybody in your plant adding water and sugar to your product?

"A. No, none to my knowledge."

The jury returned a verdict of "Not Guilty" to this Count. Count VI charged Arthur Becker with perjury by this testimony:

"Q. According to your knowledge, Mr. Becker, at any time during your position as plant manager and secretary and treasurer of the corporation, has water or sugar been added to the product?

"A. No, Sir.

"Q. According to your knowledge during the time that you have been plant manager and secretary and treasurer of the corporation, have you suspected anybody of adding water or sugar to the product in your plant?

"A. No, Sir.

"Q. I'll ask you if in the operation and production of your product if anything is included in the product when it is packaged and processed other than the natural juices of the oranges with a possible exception of frozen orange concentrate that has been identified and for which you are not charged?

"A. No, Sir."

By a "Not Guilty" verdict he also was exonerated. Counts III, IV, and V charged the Defendant Gordon Van Liew with making certain perjured statements. The jury returned a "Not Guilty" verdict as to Count V, and convicted the Defendant on Counts III and IV with which we are concerned here.

nal hearing on the motion for preliminary injunction in the civil case. Though finding the two other defendants not guilty, the jury returned a verdict of guilty as to Defendant Gordon Van Liew on Counts III [5] and IV [6] (note 4, supra). At the same time it found him not guilty as to Count V.[7] This appeal followed.

As was true in the criminal misbranding and adulteration case, Van Liew v. United States, 5 Cir., 1963, 321 F.2d 664, it should be emphasized here that the Government's attack was for *economic* adulteration or misbranding.[8] Purity, wholesomeness, or nutritiousness of the product widely distributed through reputable local dairies was not questioned.[9]

The Defendant Gordon Van Liew asserts here, as he asserted in his motion for judgment of acquittal below, that the allegedly perjured statements set out in Count IV (see note 6, supra) were lifted out of the context in which they were spoken at the injunction hearing. Consequently, there was a failure to prove either falsity or intentional falsification. We agree. It is vital, of course, that the stream of justice not be contaminated by untruth, Adams v. United States, 5 Cir., 1962, 302 F.2d 307, 310 (dissenting). But the serious-

5. After alleging the facts as to the civil injunction hearing, competency of the tribunal, the materiality of evidence concerning the ingredients of the orange drink, and the inquiry made of the witnesses, Count III charged that the Defendant Gordon Van Liew falsely testified as follows:

"Q. Mr. Van Liew, I will ask if according to your knowledge in the manufacture of orange juice and the processing of orange juice, as distinguished from the bottling drink which your brother, Mr. Dell Van Liew, mentioned a moment ago, which was called an orange drink, there has ever been added to the product any water or sugar as far as you know?

"A. No, Sir, none whatsoever.

"Q. Do you know of anybody who you ever suspected in your plant of doing such a thing?

"A. No, Sir; not to my knowledge."

The Count then concluded that "Such testimony was contrary to the oath taken by him as he then and there well knew that water and sugar had been added to the product."

6. After re-alleging the facts making the testimony pertinent to the hearing (see note 5, supra), Count IV charged that the Defendant Gordon Van Liew falsely testified as follows:

"Q. In the running of this operation or processing is there any way or any means by which water can be introduced into the product?

"A. Not to my knowledge."

The Count then concluded that "Such testimony was contrary to the oath taken by him as he then and there well knew that there was a way and means by which water could be introduced into such product."

7. Count V charged that the Defendant Gordon Van Liew committed perjury by the following testimony:

"Q. All right. In the blending of your orange juice when you mention blending to effect the tartness or the sweetness of the product, is that blending completely from orange juice?

"A. It's from orange juice and all times when this type of orange is available. We do at certain times use a certain amount of orange juice concentrate.

"Q. You mean frozen concentrate?

"A. That's right.

"Q. As far as you know is anything added to the product other than the natural fruit juice from orange juice?

"A. No, Sir; not to my knowledge."

8. The intricate structure of the Federal Food, Drug, and Cosmetic Act, the multiple nature of actions constituting various offenses as "misbranding," "adulteration," the oft-times undisclosed statutory comparatives, and the technical definitions of many relevant statutory terms are all reflected in our opinion, especially notes 9, 11, 12, 321 F.2d 677, 679, 680.

9. See, e. g., this exchange in objection to testimony:

Government counsel: "It [the testimony] is also irrelevant to the charges for which the defendants are here on trial, as to whether or not their product was acceptable and nice tasting to the consumer."

Defense counsel: "My question was as to its purity and quality."

Government counsel: "There has been no contention in this case—that the defendants' product is not sanitary."

Defense counsel: "All right, we will accept the stipulation."

ness of the crime of perjury and the fact that it turns finally on the subjective knowledge and purpose of the swearer require that the Government not be allowed to predicate its case upon the answer to a single question which in and of itself may be false, but which is not shown to be false when read in conjunction with testimony immediately preceding and following the alleged perjured statement. The oft-quoted rule is applicable here. "A charge of perjury may not be sustained by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows." Fotie v. United States, 8 Cir., 1943, 137 F.2d 831, 842; Brown v. United States, 8 Cir., 1957, 245 F.2d 549, 556; United States v. Geller, S.D. N.Y., 1957, 154 F.Supp. 727, 730, n. 3; cf. Meyers v. United States, 1948, 84 U.S.App.D.C. 101, 171 F.2d 800, 806, 11 A.L.R.2d 1.

■■ At the injunction hearing, the Defendant testified at length about the operations of his plant and the method by which they processed the orange drink. He explained how raw oranges were squeezed, how the raw orange juice was blended, how the mixture was pasteurized by a rapid heating and cooling process, and how the commodity was finally bottled and shipped to consumers. The Government's contention is that the statement "Not to my knowledge" was made in answer to a question encompassing the entire production of the orange drink. Literally this was untrue since by use of a dairy hose water could be put in the tanks. In other words, the Government's theory is that the Defendant had stated that from its inception in the raw oranges to the bottled commodity there was no way water could be added. This reading of the questions and answers is unsound. When read in light of the surrounding testimony, one of two things is clear. The first is that we think the Defendant's answer obviously referred to the pasteurization process alone.[10] But second, if this is not so as an established fact, the uncertainties as to what the interrogator thought, or what the swearer thought the interrogator thought by the words "operation or processing" are such that

---

10. The testimony constituting Count IV (see note 6, supra) is italicized.

"Q. You've told us about going through the screening process and that takes out the pulp. What is the next—

"A. Well, then the blending tanks. From there we go into a homogenizer at 25 pounds per square inch pressure. In other words, the product is completely pulverized at this point to where all the solids are in equal way to the actual liquid in the product. This way the product can be sold in glass and paper and is desirable to the public.

"From there the product goes into a flash pasteurizer where we bring the product up to 190 degrees in temperature and back down to approximately 34 to 30 degrees in 11 seconds.

"The Court: So what you meant by flash is 11 seconds?

"The Witness: Actually the product is hot for 3 seconds.

"The Court: Is that electrical heating?

"The Witness: No, sir; a heat exchanger where steam or hot water created by steam is in one plate and the juice in the next, and in the next plate would be the hot water. Every other plate is the juice, and it goes through a regenerator section. It helps tend to cool it down while it is heated.

"Then, it goes into a cooling side of this heat exchanger, which brings the temperature on down. It is similar to the hot side in [that] every other plate on this side has ice water and the other plate has juice in it. The same type of machine used for flash pasteurization of milk and common in all dairies.

"From there we go into a direct expansion chiller, 40 degrees of the product. We bring it down to between 34 and 30 degrees in direct expansion chiller. From there it goes to a holding tank which is a gravity tank which goes into our various fillers, both glass and paper filler.

"Q. After it is filled it is marketed in the glass and—

"A. It is then put in our vault and kept under constant refrigeration and hauled to our customers by our fleet of refrigerated trucks.

"Q. All right. Now, those processes and the machinery you have available

neither we nor a jury could hold that knowing falsification was proved beyond a reasonable doubt. Moreover, there is no showing in the record, either at the injunction hearing, the adulteration and misbranding criminal prosecution, or the perjury trial, that water was added, or could be added, through this pasteurization process. The conviction as to Count IV is accordingly reversed and remanded with directions that a judgment of acquittal be entered.

■ As to Count III, the Government had the burden of proving by clear, convincing and direct evidence to a moral certainty and beyond a reasonable doubt that the Defendant knowingly and intentionally swore to a falsehood. The Government's proof must be by substantial evidence excluding to the satisfaction of the jury every other hypothesis than that the Defendant in testifying as he did purposefully misstated the fact knowing it to be false and untrue. Brown v. United States, 8 Cir., 1957, 245 F.2d 549; Blumenfield v. United States, 8 Cir., 1962, 306 F.2d 892; Beckanstin v. United States, 5 Cir., 1956, 232 F.2d 1; United States v. Rose, 3 Cir., 1954, 215 F.2d 617; United States v. Neff, 3 Cir., 1954, 212 F.2d 297; McWhorter v. United States, 5 Cir., 1952,

193 F.2d 982; Fotie v. United States, 8 Cir., 1943, 137 F.2d 831. The Government did not meet its burden here.

The Defendant asserts two reasons why the proof was insufficient as a matter of law. The first is one with which the parties in brief and argument have been much—if not too much—preoccupied. The Defendant contends that when he stated no water or sugar had been added to the "product" (see note 5, supra), this meant he was testifying that no water or sugar had been added to the resulting finished commodity after it had been through the mixing stage. Of course there is no showing anywhere that water or sugar was added to the final commodity. The Government takes the opposite viewpoint. It claims that the Defendant understood the term "product" to mean the commodity during any stage in the processing. To show this, the Government points to the fact that in Defendant's testimony, he frequently used the word "product" when referring to the commodity during its processing stages. The Government's position in this regard is buttressed by the implied jury finding that the Defendant knew the term "product" meant the in-between processes.[11]

have been constantly open to the government inspectors?

"A. Yes, very definitely.

"Q. Are they standard type of operations for the production of this type of orange juice?

"A. I would say so. Now, as far as standard types, all citrus processers have what they feel is their own exact process, as to how hot to go with the product and how cold it should be kept, and most of our competition from Florida do not homogenize their product. They feel it is better to leave the heavy, stringy pulp in it and sell the product in that form.

"[Government Counsel]: I wonder, Your Honor—he is talking about what other processers think and—

"Q. I ask them was it a standard process and he answered the question. I believe you told the Court that the equipment you use for the flash pasteurization is the same type of equipment that is normally used by the dairies in this area?

"A. Yes, that's true. The dairies use a holding tub and actually pasteurize the product, what we call the flash, and this holding tub holds the product for 17 seconds.

"Q. *In the running of this operation or processing is there any way or any means by which water can be introduced into the product?*

"A. Not to my knowledge.

"Q. Not to your knowledge. Is there any way in which water will come into the product by the mode of operation? You mentioned the water in the plates, the hot water and cold water in the plates. Is the water separated from the orange juice in that process?

"A. Yes.

"Q. The water in the plates doesn't get in touch with the orange juice?

"A. No, just the heat and coldness of it."

11. The Court charged that "The defendants in this case have all testified, in

While we do not discard altogether this emphasis on "product" as having no controlling significance, we think the second ground is both sound and unanswerable. It likewise lends intrinsic support to the idea that the witness thought the inquiry related to a time subsequent to blending. The second contention is that the record in the civil injunction proceeding as reflected by excerpts introduced in the perjury trial shows positively that in the making of this "product" frozen orange concentrate was customarily and frequently used when and as needed to stabilize the taste of the finished commodity.[12] Actually this practice is so much a part of the processing of drinks of this kind

that little was said about it in so many words, and in no event was the use of concentrates claimed to be adulteration or misbranding. Orange concentrate, as its name implies, is the result of evaporation of liquids out of single strength fresh raw orange juice, pulp, peel, etc. Commercial, governmentally recognized standards are used to determine the extent of concentration. The higher the Brix (relative weight of solids to total weight), the higher is the concentration. This is a perishable and concentrate is shipped and stored under deep refrigeration.

Since the testimony from all sources acknowledged that the taste, the sweetness, tartness, insipidness, etc. of orange

substance, that they believed that when they were asked if they had added water and sugar to their product that they meant by the product their finished product and not an in-between process. If you believe their testimony, you are to say by your verdict 'Not Guilty.' "

The jury was apparently concerned about the use of the word "product" because after deliberating for some time, they requested the Judge to give them a definition of "product." The Judge's response to this request is not included in the record.

12. This is shown by the excerpt from the Defendant Gordon Van Liew's testimony: "A. * * * We do at certain times use a certain amount of orange juice concentrate.

"Q. You mean frozen concentrate?

"A. That's right."

This testimony was part of the alleged false testimony which was the basis of Count V. The jury's acquittal of the Defendant on that Count inferentially means they thought this was the truth.

There is additional testimony on this score from Arthur Becker:

"Q. Mr. Becker, you have said concentrate is used to some extent in the manufacture of this orange juice?

"A. Yes, sir.

"Q. That concentrate is added regularly, is it not?

"A. Only when needed sir.

"* * * * *

"Q. When is it needed?

"A. When the acid is down on the fruit.

"Q. In other words, then you add the concentrate because the concentrate has

a high acid content, is that right?

"A. Yes, sir."

During the perjury trial, the Government introduced excerpts of testimony of Dell Van Liew given at the criminal prosecution for adulteration and misbranding:

"Q. Well—

"A. In other words, you take commercial concentrate, it would take, for one gallon of concentrate, approximately five to five and a fraction gallons of water.

"Q. That's exactly what I wanted to know, the kind of concentrate you were using. One to five—

"A. Varying on the degree of Brix.

"Q. —quantities of water, to one part of concentrate?

"A. That is right. That is right, sir.

"Q. So if you put in a gallon of concentrate, you would add five gallons of water?

"A. That is right. That is right.

"Q. And come out with six gallons of reconstituted juice?

"A. That is right. And I believe that is just about the standard on 58 Brix.

"Q. I see. Now, you told us that, in your testimony in the other Court, before the Judge there—

"A. Yes, sir, uh huh.

"Q. —that when you stated there was no water added, you meant no water other than what was necessary to build the concentrate back up to standard?

"A. That is right, sir.

"Q. Did I understand you correctly?

"A. Exactly. That is right, sir.

"Q. And you understood, I suppose, that the Judge would take it that way?

"A. I assumed as such, yes, sir."

varies with the type of oranges, climatic conditions, area of growth, state of maturity, and the like, it is necessary frequently to blend juices to maintain a uniform product. A principal factor is uniformity in sweetness or tartness, a matter which relates directly to the relative acidity or sugar content of any given lot of oranges or juice therefrom.

This blending may be done in several ways. One way is to mix two or more lots of single strength fresh raw orange juice. Another, and altogether legitimate, governmentally recognized way is to use frozen concentrates. But a frozen concentrate is in a semi solid state. If a desired amount of a concentrate is to be mixed with single strength raw orange juice in order to bring taste up or down to the desired level, it means that in the resulting liquid product the amount of solids has thereby been increased.[13] This is avoided, however, by mixing water with the concentrate. Restoring to concentrate the water evaporated from it is called reconstituting.

Not only is there no doubt as a physical proposition that in the phenomena of concentrating and reconstituting, water is taken out and then restored, but the Government's own case in the perjury trial established that when concentrate is used the industry knows two things. First, water will be added. And second, sugar as needed will be added.

The Government had to establish two main things (besides wilful intent): (1) the testimony given by Defendant in the civil trial, and (2) the falsity thereof. It undertook to prove (2) by testimony of two witnesses who worked in the plant. These witnesses testified that concentrate was used in blending to achieve a uniform product, and that in that operation water, sugar or both were added. But each then acknowledged with like positiveness that when concentrate is used, it is certain that water, sugar or both will be added, and that this is known to the industry. Consequently, when inquiry reveals that concentrate is used, a person in the industry knows that water (and sugar) is added.[14] In testifying that no water (sugar) is added when concentrate has been used, a person in the industry would necessarily be referring to steps subsequent to the reconstitution.

Any other conclusion makes little sense. The questions propounded on the civil injunction hearing, as well as frequent references to samples taken for dechemists appearing as witnesses made it clear that concentrates were regularly used. That being so, it would have been sheer folly for the Defendants to have

---

13. The implication of the testimony sought to be elicited by the Government as well as its arguments on brief is that while all know that *some* liquid must be put back into the semi-solid concentrate, the statutory evil was here the use of water, not single strength pure raw orange juice as the diluent. This demonstrates again the inherent difficulties under this Act in the absence of governmentally promulgated standards (see, e. g., § 343(g) ). For mixing (a) single strength orange juice with (b) concentrate which has been converted to a fluid through use of (c) other single strength juice would likely be a statutory adulteration itself, no matter how wholesome, pure or fair. This is so because the resulting mixture of (a), (b) and (c) would come under the literal, if ambiguous, language of § 342 (b) (4) as a " * * * substance * * * added thereto or mixed or packed therewith so as to increase its bulk or weight, or reduce its quality or strength, or make it appear better or of greater value than it is."

14. Government witness Donaldson testified on direct examination:

"Q. Thank you. Mr. Donaldson, in early 1959, when you started making juice, what ingredients did you put into a tank when you would make a tank of juice?

"A. That would be commercial concentrate, sugar and water and orange juice.

" * * * * *

"Q. Mr. Donaldson, is there a difference between the terms concentrate and re-constituted juice?

"A. Well, now, I wouldn't know how to answer that.

"Q. What is concentrate?

"A. That is—I don't know how to say

tailed chemical analysis by Government denied that water (and sugar as needed) was mixed with concentrate to reconstitute it. In any event, the Government's case [15] did not do more than show that there were two plausible interpretations to be placed on what the interrogator meant. Assuming that perjury could nonetheless be committed in such context, the deficiency of the proof here is demonstrated by considering what the Government would have to establish in that setting. It would have to establish that (a) the interrogator used the words with the meaning intended by the Government, and that (b) the swearer knew (i) the sense in which the interrogator used the words and (ii) nevertheless intentionally gave an answer which he knew to be false to the question as thus

it in words. It is the product that has been concentrated, in other words.

"Q. Well, what is reconstituted juice, then?

"A. Reconstituted juice?

"Q. Yes, sir.

"A. That is—you take the concentrated product and build it back up to its original state.

"Q. With what?

"A. With the water and sugar."

He testified on cross-examination:

"Q. If I understand your testimony, when you use concentrated juices, you have to reconstitute those juices, don't you?

"A. Yes, sir.

"Q. And to reconstitute them, it is necessary to add back the water and sugar?

"A. Yes, sir.

"Q. All right. And when you in the orange juice industry understand or hear the word used of using concentrates in your blending, you understand, in the industry, do you not, that that means using the sugar and water to bring it back to its natural state?

"A. Yes, sir.

"Q. And if anyone had asked you, in the orange juice industry, if in using the concentrate—you said you used concentrate—you yourself, as a worker in that industry, would understand, would you not, that that meant reconstituting the concentrate with the necessary water and sugar to bring it back to its natural state?

"A. That's right.

"Q. Now when you blend there, in using these concentrates, and bring them back to their natural state, that is what you do when you add the sugar and water?

"A. Yes, sir.

"Q. Now after you once get it blended that way in the blending tank, when you have your product made, you have never seen anybody out there dilute it beyond that, have you?

"A. No, sir, I have not."

Government witness McCurdy testified on direct examination:

"Q. Mr. McCurdy, when a tank of juice was made at that time, will you please tell the jury what ingredients went into it?

"A. We used fresh orange juice, concentrate, sugar and water."

On cross-examination he testified:

"Q. You do know, do you not, that in the production of this dairy-type orange juice on a commercial basis, the industry uses what are known as frozen concentrates?

"A. I am very sure of that, the industry in general.

"Q. And when you speak of using frozen concentrates in the production of your juice, you understand, yourself, do you not, that it is necessary to use water to reconstitute the juice?

"A. Definitely. I don't know what else you could use.

"Q. Can you use concentrates without using water to reconstitute?

"A. Not to my knowledge.

*        *        *        *        *

"Q. You do know, do you not, from your experience in the industry, that when you speak of using concentrates in the production of your orange juice, that you mean the use of water to reconstitute the original content, didn't you?

"A. That's correct.

"Q. And you mean, do you not, the use of whatever amount of sugar is necessary to reconstitute the original flavor?

"A. That's right.

*        *        *        *        *

"Q. Now have you ever seen anybody add water and sugar to dilute the juice after you have prepared the product itself in the blending tanks?

"A. No, sir, not while I have been there."

15. We may assume that the effect of a rebuttal expert's testimony was to disagree with that of Government witnesses McCurdy and Donaldson, see note 14, supra.

put in the sense thus intended. Whatever might be the actual fact, the evidence is not adequate to carry the burden that beyond a reasonable doubt the Defendant knew these things.

■ Since the words asked and answered cannot change, and nothing may now be done to alter or improve the Government's case, the cause must be remanded with direction to enter a judgment of acquittal on both counts.

Reversed and remanded with directions.

TUTTLE, Chief Judge, concurs in the result.