THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ROBERT WILLS, Defendant-Appellant.

First District (5th Division)    No. 62162

Opinion filed November 24, 1976.

Sherman C. Magidson, of Chicago (Carl P. Clavelli, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon and Michael E. Shabat, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BARRETT delivered the opinion of the court:

Defendant was charged by indictment with three counts of perjury subsequent to his testimony before the Cook County grand jury investigating improprieties in the licensing procedures of the Illinois Department of Insurance. Following a bench trial, defendant was convicted of all three counts and sentenced to four years' probation with the first six months to be served in a work release program. This appeal followed.

At trial, William M. Daley testified that he had first taken an examination to obtain an insurance broker's license in July, 1972. Having failed the examination, he had again taken the test on March 16, 1973. Daley was subsequently notified that he had passed this second examination. When shown his March 16 examination paper, he identified

his signature on the examination, but could not identify all of the answers as having been written in his handwriting.

Gordon Casper testified that he had supervised the licensing examination given in Chicago on Friday, March 16, 1973. Andrew Preer assisted him. At the end of the day, all of the test papers were put into a briefcase and taken back to Casper's home in Springfield for the weekend.

Defendant, who had recently been discharged as an insurance examiner, telephoned Casper the following Sunday and asked whether "Mr. Daley" had appeared for the examination. Casper checked the list and told defendant that Daley had taken the test and that defendant could come by to talk. Defendant arrived 20 minutes later and Casper handed him the Daley examination. Defendant read the test paper and stated that too many questions were left unanswered. He asked Casper if he could fill in some answers "as a favor to Senator Partee." Casper agreed and defendant spent about 20 minutes filling in several answers with a pen. Casper then replaced the test with the other papers. The next day, Casper took all of the examinations to his office and graded them. He gave the Daley examination a passing score and recorded the grade.

A year later, both men received subpoenas to testify on March 20, 1974, before the Cook County grand jury investigating licensing irregularities at the Department of Insurance. They met the Saturday before their scheduled appearances and agreed that they should "just play it cool like we had before" and, when traveling to Chicago together to testify, again agreed to maintain their story.

Casper testified before the grand jury a second time on May 10, 1974, under a grant of immunity. Defendant had already been indicted. Prior to his appearance, Casper met with defendant and told him that he had spoken with his attorney and had decided to tell the truth. Defendant stated that he wouldn't change his story.

On cross-examination, Casper stated that he initially told the grand jury that he knew of no one in the Department of Insurance who wrote anything in the examination paper. He believed this to be true since defendant had been discharged on March 2, 1973, and the examination was given on March 16, 1973.

Antonio A. Canter, a chemical physicist specializing in ink and paper analysis for the United States Treasury Department, was called as a witness and stated that he examined the test paper and concluded that the answers to questions 1B, 13, 29B, 42, 44A, and 46 were written in an ink different from that used to write the other answers. Michael J. McEachen, a document examiner for the United States Treasury Department, testified that he compared the answers written in the William Daley

examination with various handwriting exemplars and concluded that defendant had written several of the answers on the examination paper.

Defendant offered no testimony, but entered into evidence the original indictment charging him with perjury and the transcript of Casper's testimony before the grand jury on March 20, 1974. The transcript of defendant's testimony before the grand jury had been introduced into evidence earlier. After closing arguments, the court entered judgments of guilty.

Although defendant raises several contentions on appeal, the view we take of this case requires us to address only one issue.

OPINION

As he did at trial, defendant contends that a conviction would be improper since the answers he gave were either literally true or truthful in the context of the ambiguous questions defendant was asked.

Defendant appeared before the grand jury and testified that he was employed by the Department of Insurance from June 1969 to March, 1973. He was handed an insurance examination by the assistant state's attorney conducting the examination and was asked:

"Q. Did you grade this examination?

A. I think so although it doesn't have my initial on it.

Q. Is this yours?

A. Yes.

Q. This is John Patrick Daley's examination?

A. Yes.

Q. Do your initials appear on this examination?

A. No, that is what I was looking for.

Q. And how do you know that you graded this one?

A. Well it looks like my handwriting.

Q. You mean the ones and the twos?

A. Right.

Q. Did you have anything to do with the applications for examinations?

A. No, sir.

Q. Did you ever look at the applications?

A. I had no reason to.

Q. On this application it shows that the application was filled out on August 1st, 1971, the examination was December 3, 1971, and yet it shows here that the examination fee was not paid until December 22, 1971?

Q. I know nothing about it."

After these questions which concerned the John Daley examination,

defendant was asked several questions concerning the payment of examination fees,[1] and was then questioned about attempts to influence the grading of examinations:

"MR. KESSLER: Q. Has anyone there ever offered you anything of value for grading an examination favorable to them?

A. Never.

MR. IVARONE: Q. Have you ever received anything for grading an examine [*sic*] for someone?

A. Never. Never. Nothing, no.

Q. In your course of employment with the insurance department have you ever encountered such offers to other graders?

A. Repeat your question please?

Q. While you were working for the department of insurance did you ever become aware of any offers to others?

A. I have heard of it yes.

Q. Who? What examiner?

A. Well I have been offered myself. This was very common. Anyone that has anything to do with a license this is very common to anybody.

Q. Wait a second; you said that you were never offered anything of value?

A. Oh I am sorry I misunderstood you. I thought you said did you ever take anything of value.

Q. Okay. People did offer you money?

A. I have had an offer, yes.

Q. Do you recall who?

A. I wouldn't know who they were. I made it appear as if I were insulted for your offering me to take the money.

Q. How many times did this happen?

A. Well actually say a half a dozen times I wouldn't know really the number.

---

[1] "Q. Do you know if it was customary for people to pay after the examination was taken or to pay before the examination was taken?
A. Well the policy is to pay before the examination.
Q. Who would handle, who would have handled the payment of examination fees?
A. Well they have a section there that takes care of all of the applications.
Q. Who is in charge of that section?
A. I don't know who is right now.
Q. Who was at the time?
A. A lady but I do not recall her name; I don't recall her name. You are speaking of 1971?
Q. Well from August to December?
A. I can't recall her name. There could have been a man. Couldn't there have been a man in charge of that department? I thought possibly you knew and were just asking me; well there is a man in charge of that department right now.
Q. Who is that?
A. Winston Nevelle is the name if he is the same man now that was when I was there."

Q. Did you ever change anyone's answer on an examination?

A. Never.

Q. Did you ever cross out words that someone had written on an exam?

A. No.

Q. Have you ever written in answers for someone?

A. Never."

The last three questions formed the bases for the three counts of perjury contained in the indictment.

Defendant's position is that the questions were asked in a context which was limited to the period of time when he was employed by the Department of Insurance, and that his answers were not proven to be untrue since the evidence at trial pertained to acts committed subsequent to March 2, 1973, the date his employment terminated. Defendant argues that his grand jury testimony dealt with the *John Daley* examination, which he admittedly graded, while the evidence at trial, at best, proved only that defendant altered the *William Daley* examination after his employment had ended. The State's position is that defendant's perjurious answers were in response to questions which were not limited to any period of time and included any alterations made to the William Daley test paper.

The three questions posed to defendant which are now in issue asked:

"Did you ever change anyone's answer on an examination?"

"Did you ever cross out words that someone had written on an exam?"

"Have you ever written in answers for someone?"

If viewed alone, these questions are not limited to a specific period of time, and the evidence at trial would be abundant to prove that defendant committed perjury when he answered in the negative. However, these questions cannot be viewed in isolation. "A charge of perjury may not be sustained by the device of lifting a statement of the accused out of its immediate context and thus giving it a meaning wholly different than that which its context clearly shows." *Fotie v. United States* (8th Cir. 1943), 137 F.2d 831, 842.

In *Van Liew v. United States* (5th Cir. 1963), 321 F.2d 674, the government sought to prove that defendant committed perjury when he testified at an injunction hearing about the operations of his plant and the method of processing an orange drink. The indictment alleged that defendant had testified falsely as follows:

"Q. In the running of this operation or processing is there any way or any means by which water can be introduced into the product?

A. Not to my knowledge."

The government argued that defendant's answer was literally untrue in that it was made in response to a question encompassing the entire production process. Defendant contended that his answer was only in reference to the pasteurization portion of the process and thus was not false. The court (321 F.2d 674, 677-78) stated:

> "It is vital, of course, that the stream of justice not be contaminated by untruth. But the seriousness of the crime of perjury and the fact that it turns finally on the subjective knowledge and purpose of the swearer require that the Government not be allowed to predicate its case upon the answer to a single question which in and of itself may be false, but which is not shown to be false when read in conjunction with testimony immediately preceding and following the alleged perjured statement."

The court agreed with defendant that the context of the entire testimony indicated that the answer obviously referred to the pasteurization process alone. The court also observed that even if this conclusion was "not so as an established fact, the uncertainties as to what the swearer thought the interrogator thought by the words 'operation or processing' are such that neither we nor a jury could hold that knowing falsification was proved beyond a reasonable doubt." 321 F.2d 674, 678.

■■ Similarly, in the instant case, defendant was sworn to testify before the grand jury and handed the John Daley examination taken in December, 1971, and graded by defendant. After several preliminary questions, defendant was asked whether he had been offered or had received anything for *grading* an examination *in the course of employment with the Department of Insurance*. In that same series of questions inquiry was made as to whether defendant had altered examinations. It is the answers to these questions that the State contends were perjurious. The questions which followed pertained to the grading of the John Daley test paper which was done during defendant's employment, his proficiency in grading examinations, and the reasons for his discharge. At no time was defendant questioned about the William Daley examination which was altered after defendant's employment. Therefore, since the entire context of the interrogation focused on the period of defendant's employment, it is apparent that the questions which constituted the bases for the perjury indictment were also limited to that period of time, and perjury was not proven. The other alternative, that the questions were confusing or ambiguous as to the period of time referred to, compels us to reach a similar decision.

■■ The State on appeal argues that defendant, at trial, did not claim that he was confused about the context of the questioning, and therefore should not enjoy the benefits of the ambiguities which may be attributed to the interrogation. No such claim by a defendant need be made. (See

*Van Liew v. United States* (5th Cir. 1963), 321 F.2d 674.) It is the burden of the State to formulate questions which are not misleading or ambiguous in the context of the interrogation. A defendant cannot be convicted of perjury for a truthful answer to a question which may be subject to various interpretations. (*People v. White* (1974), 59 Ill. 2d 416, 322 N.E.2d 1.) "Precise questioning is imperative as a predicate for the offense of perjury." *Bronston v. United States* (1972), 409 U.S. 352, 362, 34 L. Ed. 2d 568, 576, 93 S. Ct. 595, 602.

■■ It is apparent to us from the evidence adduced at trial that defendant would have committed perjury if it became necessary in order to conceal his wrongdoing. The questions asked, however, failed to give defendant the opportunity to do so. Regardless of defendant's intention to answer falsely to certain questions, there can be no perjury so long as the witness spoke the truth. *Bronston v. United States* (1972), 409 U.S. 352, 34 L. Ed. 2d 568, 93 S. Ct. 595.

A careful review of the record in this case reveals several factors which adds support to our decision. When Gordon Casper testified before the grand jury for the first time on March 20, 1974, he was asked the names of those persons who graded the March 16, 1973, examinations. Casper answered that "March 16, 1973 Wills was. I don't know if Wills was there or not, but I know his name was Preer Wills."[2] To add to this confusion over whether defendant was still employed on March 16, defendant testified before the grand jury that he was employed grading insurance examinations to March of 1973, but never stated the exact date that he was terminated. Since William Daley had taken the examination in March of 1973, it is highly probable that the grand jury mistakenly believed that defendant was employed as an insurance examiner when the test paper was altered.

The conclusion that the grand jury initially believed that defendant altered the examination while still employed is further supported by comparing the language used in the original indictment to that used in the superseding indictment. After defendant and Casper had testified on March 20, 1974, the grand jury returned a three-count indictment, each count charging that defendant answered perjuriously "[w]hen asked the following question *pertaining to his function in grading insurance examinations for the Illinois Department of Insurance* * * *." (Emphasis supplied.) It was not until after Casper's second appearance before the grand jury, when their mistake was presumably realized, that a belated attempt was made to attribute a broader scope to the questions asked defendant. The superseding indictment charged that defendant committed perjury "[w]hen asked the following question pertaining to

---

[2] The parties have stipulated that the transcript of proceedings before the grand jury should contain a comma between the words "Preer" and "Wills."

the intentional unauthorized alteration of insurance examination answers on Insurance Broker's Examinations given by the Illinois Department of Insurance." Thus, the original indictment clearly indicates that the result of the testimony given March 20, 1974, was to create a misapprehension in the grand jury that defendant was employed when he altered the test.

For the foregoing reasons, the judgment of conviction is reversed. Since there was a total absence of proof at trial that defendant altered examinations while employed with the Department of Insurance, remandment of this case for a new trial would serve no purpose.

Reversed.

LORENZ, P. J., and SULLIVAN, J., concur.