UNITED STATES of America, Plaintiff,

v.

Henry McComb WINCHESTER, Jr., Defendant.

Crim. A. No. 75-105.

United States District Court,
D. Delaware.

Dec. 24, 1975.

W. Laird Stabler, Jr., U. S. Atty., and Alan J. Hoffman, Asst. U. S. Atty., Dept. of Justice, Wilmington, Del., for plaintiff.

David N. Webster and Robert P. Watkins, of Williams, Connolly & Califano, Washington, D. C., for defendant.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

Henry McComb Winchester ("Winchester"), a former director of the Wilmington Federal Housing Administration ("FHA") office, was charged in a 131-Count indictment on July 9, 1975.[1]

Winchester has filed the following motions[2] which, after briefly describing the indictment, are treated seriatim:

A. A motion to sever certain Counts of the indictment

B. A motion to dismiss Counts 40 through 58 for failure to state an offense

C. A motion to dismiss Counts 97 through 129 because of their failure to inform defendant of what he must meet

D. A motion for disclosure of grand jury records and

E. A motion for discovery.

Generally, the indictment arises out of two alleged schemes in which Winchester and other participants defrauded the Government. One scheme allegedly concerned bid-rigging activities on the part of Winchester and unindicted co-conspirator John F. Kelleher ("Kelleher"). The second scheme is supposed to have entailed Winchester's use of his influence as FHA director on behalf of unindicted co-conspirators Frank P. Pullella and David Pierce. Specifically, the indictment charges that Winchester set up a system of fraudulent and noncompetitive bidding on Department of Housing and Urban Development ("HUD") general contracting work so that companies controlled by Kelleher could submit the lowest bid and thus obtain work. According to the indictment, Kelleher was at the time of the alleged offenses an "area management broker" employed by the Department of Housing and Urban Development.[3] In addition, Kelleher allegedly held a substantial financial interest in three construction companies

---

1. The present indictment, returned July 8, 1975, superceded a previous 139 Count indictment which had been returned on June 5, 1975.

2. At oral argument on the within motions, the Court was advised Winchester would timely (after the government produced certain data) file a further pre-trial motion which was scheduled for hearing on December 22, 1975.

3. The indictment defines the term "area management broker" as follows:

"A real estate broker engaged by the Department of Housing and Urban Development as a person acting on behalf of the United States whose duties include, but are not limited to, managing Department of Housing and Urban Development owned and leased properties in an area designated by HUD, assuring contracts awarded for rehabilitation work to be performed on said HUD owned properties, and inspecting said properties and certifying that the rehabilitation and general contracting work has been properly performed."

which regularly submitted bids on HUD contracting work. The counts of the indictment dealing with Winchester's Kelleher-connected activities allege violations of several statutes: conspiracy: 18 U.S.C. § 371 (Count 1); conspiracy to defraud the government with respect to claims: 18 U.S.C. § 286 (Count 4); accepting bribes and gratuities: 18 U.S.C. § 201(c) (Counts 13–20); aiding and abetting false statements on matters within government agency jurisdiction: 18 U.S.C. § 2 and § 1001 (Counts 21–39); aiding and abetting submission of false claims to HUD: 18 U.S.C. § 2 and § 287 (Counts 40–58); aiding and abetting a conflict of interest: 18 U.S.C. § 2 and § 208 (Counts 59–96); and submitting false statements to HUD: 18 U.S.C. § 1010 (Counts 97–129).

The indictment contains additional allegations that the defendant accepted bribes or gratuities in exchange for the use of his influence to gain the selection of Frank P. Pullella and David L. Pierce as general contractor and packager[4] on Banecker Heights and Whatcoat Community Development—"both multi-family housing projects insured under the National Housing Act." Indictment, Docket No. 1 at 10. Winchester is also accused of accepting payments in exchange for aid in "processing and packaging" the Whatcoat project, and in return for granting "favorable labor decisions" with respect to both projects. Id. The Grand Jury additionally charged that Winchester attempted to obstruct justice and a criminal investigation by trying to persuade Pullella "to give false testimony" before the Grand Jury and

attempting to prevent Pullella from communicating his knowledge of criminal activities to the ongoing investigation. Id. at 15. The crimes alleged in Counts 5–12[5] involving Pullella and Pierce are as follows: obstruction of justice: 18 U.S.C. § 1503 (Count 5); obstruction of criminal investigation: 18 U.S.C. § 1510 (Count 6) and accepting bribes and gratuities: 18 U.S.C. § 201(c) and (g) (Counts 7–12).

Finally, defendant Winchester is charged with the willful filing of false income tax returns for the calendar years 1970 and 1971, a violation of 26 U.S.C. § 7206(1) (Counts 130 and 131).

## A. *Motion for Severance*

Defendant alleges misjoinder of the counts pursuant to Fed.R.Crim.P. 8(a) and prejudicial joinder within the meaning of Fed.R.Crim.P. 14.

Initial consideration must be given to defendant's Rule 8(a)[6] contentions since "Rule 14 dealing with relief from prejudicial joinder only comes into play after it has first been determined that joinder was permissible under Rule 8. . . ." *United States v. Graci*, 504 F.2d 411, 413 (3d Cir. 1974). Even in the absence of prejudice, Rule 8 defines the permissible limits of a joint trial of offenses. *Id.* at 413. "Rule 8 is an attempt to set the limits of tolerance, and any joinder which does not fall within it is per se impermissible." *King v. United States*, 355 F.2d 700 (1st Cir. 1966); *accord, Graci, supra* at 413; *see* 8 J. Moore, *Federal Practice* ¶ 14.02[1] at 14–3 (1975 ed.). Thus, the finding of a misjoinder would require the Court to sever

---

4. The indictment defines the term "packager" as follows:
 "A person or firm engaged to furnish services in connection with the financing, construction, or operation of a multi-family project, including but not limited to the initiation, processing, financing, and selection and negotiation of contracts with a general contractor or sponsor.

5. Counts 2 and 3 were dismissed by Order of the Court on October 17, 1975 (Docket No. 30) pursuant to a motion by defendant to which the Government acquiesced.

6. Fed.R.Crim.P. 8(a) provides that:
 "a) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

the counts as a matter of course without regard to the merits of defendant's claims of prejudice under Rule 14.[7]

The defense contends that none of the three situations in which a Rule 8(a) joinder might be proper are present here and that "the counts involving Kelleher should be severed from the counts involving Pullella and Pierce . . . ." Defendant's Memorandum, Docket No. 8 at 2. This contention rests in part on an asserted distinction between the Kelleher-related bid-rigging activities, and the use of influence on behalf of Pullella and Pierce involved in most of the indictment's remaining counts. The defendant argues, the Government concedes, and the Court agrees that joinder of the totality of counts here cannot be justified by Rule 8(a)'s "based on the same act or transaction . . ." standard.

The question of whether the indictment's counts are "of the same or similar character . . ." or are based "on two or more acts or transactions connected together or constituting parts of a common scheme or plan" within the meaning of Rule 8(a) is a more difficult determination. There is no numerical limit on the joinder of offenses, although questions of prejudice under Rule 14 might be raised. 8 J. Moore, *Federal Practice* ¶ 8.05[2] at 8–18 (1975 ed.). The parties have presented the Court with two disparate mechanical theories concerning the way in which Rule 8(a) orders the relationships of the various offenses charged.

The defendant views the counts as falling into two natural and unrelated groups representing "two separate and distinct courses of conduct." Not unexpectedly, one group is said to touch upon the Kelleher bid-rigging activities, while the other centers upon the defendant's alleged involvement with and on behalf of Pullella and Pierce. The prosecution eschews this characterization of the charged offenses and urges the indictment's counts not "be split based upon witnesses as opposed to based upon offenses committed by the defendant." The Government's analysis results in a breakdown of the offenses into two categories: bribery charges under 18 U.S.C. § 201 and bid-rigging related charges under 18 U.S.C. §§ 286, 287, 1001 and 1010. The Government next argues that all of the bribery charges meet the "similarity" test, while the bid-rigging charges come within both the "similarity" and "connected transactions or common scheme" standards. In a final logical leap of faith, the Government asserts that the two offense groups, bribery and bid-rigging, fall under the same umbrella characterization because they concern "violation of integrity of public office . . . ."

While *United States v. Barrett*, 505 F.2d 1091 (7th Cir. 1975), cited by the Government, upheld the joinder of mail fraud, bribery, and tax evasion charges on a theory that separate kickback schemes involving purchasing and insuring of voting machines "were two transactions connected by Barrett's use of his public office for private gain," it does not control the instant case.[8] Moreover, Judge Stevens' dissenting opinion in *Barrett*, labeling the breach of public trust connection too "tenuous," is far more convincing in its analysis. The

---

7. Fed.R.Crim.P. 14 provides that:

"If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial."

8. The *Barrett* court relied partially upon *United States v. Isaacs*, 493 F.2d 1124 (7th Cir.), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974). *See also Daly v. United States*, 119 U.S.App.D.C. 353, 342 F.2d 932 (1965).

Government attempts to find further support for its theory of "abuse of office" as an indicator of Rule 8 commonalty in *United States v. Weber*, 437 F.2d 327 (3d Cir. 1970), *cert. denied*, 402 U. S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). In *Weber*, a union business manager was convicted on six counts of an eight count indictment charging obstruction of interstate commerce by extortion, acceptance of bribes and conspiracy. The appellate court approved the Fed.R.Crim.P. 13 [9] consolidation of the two indictments which had produced the eight count trial, finding a common thread running through the counts:

> ". . . Common to all the counts of the consolidated indictment was Weber's alleged scheme to accept monies from contractors working in New Jersey and employing members of Weber's union." 437 F.2d at 331.

Weber's "plan," according to the court, had been "to control pipeline construction in New Jersey for his own pecuniary benefit . . . ." *Id.* at 333.

However, the Third Circuit found no such common thread in *United States v. Graci*, 504 F.2d 411 (3d Cir. 1974), reversing the district court's pre-trial ex parte Rule 13 consolidation of two indictments. One indictment had charged conspiracy and substantive violations of 18 U.S.C. § 641 and § 642, alleging that the defendant had stolen and sold government property—in this case, depressant or stimulant drugs. The conspiracy, encompassing the two substantive violations as overt acts was alleged to have terminated on December 31, 1968. The second indictment alleged a one count violation of different statutory drug control provisions occurring on November 13, 1969. Although the offenses contained in the two indictments might have been lumped together as relating to the sale of drugs, or to the defendants'

over-all activities as drug traffickers, the court did not approve such a simplistic solution:

> "It is clear that the November 13, 1969 offense charged in Indictment No. 15089 is not of the same or similar character or based on the same act or transaction as the substantive offenses charged in No. 15091. Nor can the November 13, 1969 offense be construed as part of a common scheme or plan with the offenses charged in No. 15091 since that scheme or plan was alleged in the indictment to have ended on December 31, 1968. Thus it is clear that the substantive offense charged in No. 15089 could not under Rules 8(a) or 8(b), Fed.R.Crim.P. be joined in a single indictment with the substantive and conspiracy counts of No. 15091." *Id.* at 412.

The matter sub judice is by analogy, factually far closer to *Graci* [10] than to *Weber*. The crimes charged in the present indictment are not susceptible to a blanket characterization as part of a master plan keyed to a single tactical (and lucrative) goal akin to *Weber's* "plan to control pipeline construction in New Jersey for his own pecuniary benefit . . . ." 437 F.2d at 333. Instead the indictment reflects two unrelated activities: one presenting opportunities for ongoing profit over a decade; and the other a distinct and more compact operation which arose, was allegedly acted upon, and passed during the pendency of the first. The spectrum of statutes charged, the disparity of time frames involved, the different individuals implicated, and the diverse nature of the two over-all schemes militate against a *pro forma* approval of joinder.

An examination of the essential characteristics of the two lines of activities of which the defendant is accused fur-

---

9. Fed.R.Crim.P. 13 provides that:
 "The court may order two or more indictments or informations or both to be tried together if the offenses, and the defendants if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under such single indictment or information."

10. It is recognized that procedurally *Graci* involved application of F.R.Crim.P. 13.

ther highlights these differences. One line, continuing over a sustained period of time, focused upon violations in the awarding of general contracting work on numerous individual properties actually owned by HUD. The other line, an essentially "one-shot" affair, focused upon the defendant's alleged illegal activities in connection with two multi-family projects—properties which were not owned by HUD and which related to an entirely distinct aspect of HUD operations. Therefore, a misjoinder must be found in the indictment as presently constituted.

Even if a misjoinder were not found, a combined trial on all counts would bring Rule 14's strictures against prejudice into play. "There is no limit to the number of offenses that may be joined under Subdivision 8(a), although this may raise questions of prejudice under Rule 14." 8 J. Moore, *Federal Practice,* ¶ 8.05[2] at 8–18 (1975 ed.).

Rule 14 serves as a counterweight to the considerations of judicial economy and efficiency, including avoidance of repetitious trials, which are often cited as justifications for the relatively broad joinder provisions of Rule 8(a). *See United States v. Weber,* 437 F.2d 327, 333 (3d Cir. 1970), *cert. denied,* 402 U. S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971) (spirit of Rules to relieve government and courts of burden of repetitious trials); *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85, 88 (1964) (economy of single trial justifies joinder). The asserted liberality of Rule 8(a)'s provisions have, especially in regard to "same or similar" offenses, engendered significant discussion concerning the inherently prejudicial joinders which they may foster. *See* 8 J. Moore, *Federal Practice,* ¶ 8.02[1] at 8–3 n. 3, 8–20, 8–22; *id.* ¶ 14.03 at 14–7, 14–10–11.

*Drew v. United States,* 118 U.S.App. D.C. 11, 331 F.2d 85 (1964), is a leading case on the subject of prejudicial joinder. The defendant in *Drew* was tried on one count of robbery and one count of attempted robbery. On appeal, the defendant argued that the failure to have a separate trial on each count was reversible error. *Id.* at 87. The appellate court quickly concluded that the joinder was permissible under Rule 8(a) because the two crimes charged were similar in nature. *Id.* However, its detailed consideration of the possible prejudices which might result from such a joinder and which must be weighed against the desire for judicial economy constitute a concise delineation of the issues raised in the present case:

"The argument against joinder is that the defendant may be prejudiced for one or more of the following reasons: (1) he may become embarrassed or confounded in presenting separate defenses; (2) the jury may use the evidence of one of the crimes charged to infer a criminal disposition on the part of the defendant from which is found his guilt of the other crime or crimes charged; or (3) the jury may cumulate the evidence of the various crimes charged and find guilt when, if considered separately, it would not so find. A less tangible, but perhaps equally persuasive, element of prejudice may reside in a latent feeling of hostility engendered by the charging of several crimes as distinct from only one." *Id.* at 88.

In addition, the *Drew* court outlined two specific situations where the prejudice delineated might be neutralized. It pointed out that in cases where applicable evidentiary rules would allow the admission of evidence of "other crimes" if separate trials were to be held, then "the possibility of 'criminal propensity' prejudice would be in no way enlarged by a joinder. *Id.* at 90; See *id.* at 90 n. 12 (significant factor in severance decision). The court further noted that prejudice might be absent "when evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate

trials under the rules just discussed." *Id.* at 91; see *id.* at 91 n. 13.[11]

It is clear that *Drew's* warning that a trial of joined offenses requires "a vigilant precision in speech and action far beyond that required in the ordinary trial"[12] is also applicable in the Third Circuit although the strong presumption against the disturbance of trial court discretionary determinations generally precludes appellate findings of prejudice under Rule 14. Thus, the *Weber* court acknowledged the Drew-like considerations raised by the defendant, but found no evidence to indicate that the trial court had abused its discretion in its finding of nonprejudice. 437 F.2d at 332. In addition, the court noted that the admissibility of "other crimes" evidence in severed trials would negate the benefits of a finding that severance was required under Rule 14. That is not the case here. The evidence of the Pullella-Pierce and the Kelleher activities would not be interchangeably admissible in separate trials under Federal Rules of Evidence 404(b) allowing the admission of "other crimes, wrongs, or acts" for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."[13] The Government argues

that the applicability of this "other crimes" provision is justified by the presence of a "common design or scheme" on Winchester's part. This argument, essentially the same as that advanced to support a finding of commonalty under Rule 8(a), is no more convincing in an evidentiary context. Even if the technical requirements of the "other crimes" evidentiary exception were met, the overwhelming prejudice which such evidence might generate would require its exclusion. The danger of such prejudice, which would possibly be manifested in a jury perception of criminal propensity on Winchester's part or a jury tendency to cumulatively misapply "plan" evidence is too great to allow the evidence's admission regardless of its minimal probative value.[14] It is beyond question that such a determination of undue prejudice requiring exclusion of evidence is well within this Court's discretion:

"The admission of the evidence would, of course, be within the sound discretion of the Trial Court and, even if relevant, the evidence might be excluded if the District Court found it to be unduly prejudicial." *Weber, supra,* 437 F.2d at 332 n. 5a.

11. Judge Learned Hand made a similar point in *United States v. Lotsch,* 102 F.2d 35, 36 (2nd Cir.), *cert. denied,* 307 U.S. 622, 59 S. Ct. 793, 83 L.Ed. 1500 (1939). The defendant in *Lotsch* was charged with three violations of the same statute in three different transactions. Judge Hand specifically recognized the danger of "cumulation" in the case but found no prejudice in trying the charges jointly where "the evidence as to each was short and simple; there was no reasonable ground for thinking that the jury could not keep separate what was relevant to each." *Id.* at 36.

12. 331 F.2d at 94.

13. Federal Rules of Evidence 404(b) reads as follows:
"(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as

proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."
This provision is analogous to the pre-Federal Rules version discussed in *Drew. See* 331 F.2d at 90.

14. *See United States v. Barrett,* 505 F.2d 1091, 1109 (7th Cir. 1975) (Stevens, J. dissenting) (Jury's knowledge of testimony on one scheme would affect its belief of testimony on other); *Hill v. United States,* 135 U.S.App.D.C. 233, 418 F.2d 449, 451 n. 5 (1968) (even when "other crimes" evidentiary standard is met, prejudice still a possibility); 8 J. Moore, *Federal Practice* ¶ 14.03 at 14–7 (joinder of similar crimes may be prejudicial in violation of prohibition against evidence of general criminal disposition); *id.* at ¶ 8.02[1] at 8–3 n. 3; ABA Project on Standards for Criminal Justice, Standards Relating to *Joinder and Severance,* Commentary § 2.2(a) at 29 (Approved Draft, 1968) (danger of "pile up" of charges in one trial to obtain conviction).

*See generally*, Federal Rules of Evidence 403, 404 and Advisory Committee's Notes thereto.

The Government relies upon *United States v. Catena*, 500 F.2d 1319 (3d Cir. 1974), *cert. denied*, 419 U.S. 1047, 95 S. Ct. 621, 42 L.Ed.2d 641 (1974). In that case, the defendant, a doctor accused of submitting false Medicare claims, moved for severance of 100 of the 141 counts in the indictment brought against him. Following denial of the motion, twenty-seven of the counts were subsequently dismissed, leaving 114 upon which a verdict of guilty was brought in on 10. The defendant was found not guilty on each of the 100 counts for which he had requested a severance. On appeal, Catena argued that the failure to grant a severance under Rule 14 was reversible error, claiming patent prejudice in the unnecessary complication of the jury's considerations of the numerous charges and in the enhanced possibility of a "compromise verdict." *Id*. at 1326. The appellate court found "no abuse of discretion by the trial court on the facts of this case." *Id*.

*Catena* is, as the Government urges, extremely relevant to Winchester's contentions, but not in the manner which might initially and superficially be supposed. It is the wide gap between the salient facts noted in the court of appeals' review of *Catena* and the circumstances of Winchester's case which compels serious consideration of Winchester's claims of prejudice:

> "All of the claims at issue were made in a similar manner, on identical forms and for similar services. The amount of money involved in each claim was almost nominal, averaging $10 per count. The same office records of the defendant were required for each count, and the witnesses who would have been required for each trial included the defendant himself, his nurse/aide, and Blue Cross and Travelers personnel. Moreover, the period over which the alleged violations took place was reasonably limited, and the stipulated fact upon which the Government primarily relied (that the defendant was out of the country or traveling on the dates that services were claimed to have been provided) was the same for each count." *Id*. at 1326.

The above facts and the conclusions drawn from them underscore the difficulty of attempting a joint trial of both the Kelleher offense groups and Pullella-Pierce. While the Kelleher charges, for the most part, center around similar offenses with similar facts, the Pullella-Pierce counts revolve around a totally different axis of activity. Records and witnesses necessary to the proof of the two sets of charges do not possess the remarkable identity apparent in *Catena*. Moreover, each of the Winchester counts does not allege violation of the same statute. Further, in addition to the vastly differing length of time frame, there is no single set of facts or any stipulated facts in Winchester's case upon which the Government can place primary reliance in proving the charges of each of the indictment's counts.

The "simple and distinct" exception enunciated in *Lotsch* and *Drew* and discussed above is also urged by the Government as an alternate theory supporting a joined trial even where "other crimes" evidence would clearly not come in if separate trials were held. In *Lotsch*, Judge Hand found that the evidence pertaining to each of the three charges was "short and simple." *Lotsch, supra*, 102 F.2d at 36. *Weber* found it unlikely that jury confusion would arise during consideration of eight counts. 437 F.2d at 332. Here, there is little simplicity and insufficient distinction in and among the remaining counts to justify walking the perilous trial tightrope which the Government has strung. While the allegations concerning Kelleher and Pullella-Pierce related activities may be conceptually distinct, it seems unrealistic to expect such distinctions to remain clear in a trial of

the length and bulk entailed by the Government's proposal.[15]

In view of this Court's finding of misjoinder and prejudicial joinder severance will be ordered with a separate trial to be held on Counts 5–12 as requested by defendant.

There remains before the Court two tax charges, Counts 130 and 131. Defendant's memoranda are silent on this subject, but at oral argument on the motion he conceded the propriety of trying the tax charges along with Counts 1, 4 and the remaining Kelleher-related Counts of the indictment. The Court cannot disagree in light of the fact that much of the evidence needed to prove the elements of the tax offenses will be identical to that necessary for that trial absent the tax charges. It could conceivably be argued that the presence of the tax counts or the admission of evidence necessary to prove their elements might be prejudicial to the defendant. However, the defendant's agreement that the tax counts may be tried jointly with other counts saps the force of any such objection.[16] Therefore, Counts 130 and 131 will be tried with the Kelleher Counts. Accordingly, an order will be entered effecting a severance as outlined above.

### B. *Motion to Dismiss Counts 40–58*

■ The Court now turns to defendant's "Motion To Dismiss Counts 40 Through 58 For Failure To State An Offense." [17] Those Counts charge that defendant Winchester violated 18 U.S.C. §§ 287 and 2 by aiding and abetting unindicted co-conspirator John Kelleher in the knowing submission to FHA of fraudulent claims for contract payments.[18] The defendant disputes the Government's theory that the criminal sanctions of 18 U.S.C. § 287 reach instances in which "valid" claims are submitted for work performed under illegally obtained contracts. He argues that the present indictment fails to state an offense in that it does not allege that the claims submitted were themselves false, while the falsity which it does allege (in the procurement of the underlying bids) is not material to a violation of the statute.

15. *See United States v. Rowley*, Criminal Action No. 75–20 (D.Del. May 22, 1975). The Court concluded in Rowley that "a single trial of the 35 counts charging multiple instances of bribery and the 7 related conspiracy and tax evasion counts would be unduly burdensome and confusing for the jury which is to try this case. It would be unrealistic to expect the jurors to keep straight in their minds the separate evidence relating to each of the 42 counts." *Id.* at 1, *see United States v. Quinn*, 365 F.2d 256, 265 (7th Cir. 1966) (jury would have difficulty separating proof in complex and confusing five day trial).

16. *See Baker v. United States*, 131 U.S.App. D.C. 7, 401 F.2d 958, 972 (1968) (proof of larceny necessary part of tax charges); *United States v. Rowley*, Criminal Action No. 75–20 (D.Del. May 22, 1975) (tax counts to be tried with substantive bribery counts when arise out of same factual allegations).

Whatever prejudice which might arise from the joining of the tax counts with the Kelleher-related counts, and from the consequent possibility that facts relating to defendant's Pullella-Pierce activities might be used in the proof of the tax charges' necessary elements would not be of the same dimension or gravity as the massive mingling of proofs discussed above.

17. Docket No. 7.

18. 18 U.S.C. § 287 provides that:

"Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

18 U.S.C. § 2 provides that:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

"(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

The factual background of this conflict is as follows. According to the indictment, each claim was fraudulent "in that the bid upon which said contract was awarded . . . was false and fraudulent . . . ."[19] The fraudulent nature of the underlying bids assertedly derives from the activities outlined in Counts 1 and 4 of the indictment. There, the Grand Jury alleged a scheme in which defendant Winchester undertook to notify Kelleher of competing bids on a contract and to give Kelleher the opportunity to submit a lower, winning bid through one of the several companies in which he was a concealed principal. In addition, the Grand Jury charged that Winchester would fill out a bid form for a Kelleher-related company in cases where one could not be obtained from the company itself prior to the opening of bids.[20]

The differences between the Government and the defendant are rooted in their divergent interpretations of 18 U.S.C. § 287, which both parties properly refer to as the Criminal False Claims Act. Section 287's origins can be traced back directly to the original False Claims Act, R.S. §§ 3490 and 5438 (1874). These sections created civil and criminal penalties, respectively, for various types of fraud perpetrated upon the national Government or its departments. *See United States v. Neifert-White Co.,* 390 U.S. 228, n. 1, 88 S.Ct. 959, 19 L.

Ed.2d 1061 (1968). They were originally "passed in 1863 as a result of investigations of the fraudulent use of government funds during the Civil War." *Id.* at 232, 88 S.Ct. at 961; *see Rainwater v. United States,* 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). The cause of action created in R.S. § 3490 declared a statutory forfeiture and double damages as penalties for anyone adjudged to have perpetrated "any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight, Title 'CRIMES' . . . ."[21] *See United States v. Neifert-White Co., supra* at 228 n. 1, 88 S.Ct. 959; *Rainwater v. United States, supra* at 592 n. 8, 78 S.Ct. 946.

Thus any application of the civil provision, section 3490, required delineation of the activities proscribed by section 5438,[22] which mandated criminal sanctions for, *inter alia,* any person "who makes or causes to be made, or presents or causes to be presented, for payment or approval . . . any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent . . . ." *See United States v. Neifert-White Co., supra* at 228 n. 1, 88 S.Ct. at 959. It is not remarkable that this language tracks the wording of 18 U.S.C. § 287 since the criminal statutory scheme of section 5438 was carried forward in a slightly

19. Docket No. 7, Count 40, at 27. Counts 41 through 58 consist of reallegations of the essential charges made in Count 40, with the exception of variations in the dates of the alleged offenses, the identifying numbers of the purchase orders involved, the addresses at which the general contracting work was performed, the names of the general contractors, and the amount of the claims.

20. Count 1 additionally states that Winchester would permit Kelleher to inspect work performed by companies in which Kelleher was the principal when the work was performed within the area assigned to Kelleher as an FHA area management broker.

Count 4 charges a specific conspiracy to defraud the United States in violation of 18 U.S.C. § 286. In so doing, it repeats Count 1's description of "a system of fraudulent

and noncompetitive bidding" and incorporates as "Overt Acts" the acts set out in Counts 40 through 58.

21. "Originally Congress provided both criminal and civil sanctions in the same statute. 12 Stat. 696. By the Revised Statutes of 1878 the civil sanctions were codified as § 3490, while, the criminal provisions were separately enacted as § 5438." *Rainwater v. United States,* 356 U.S. 590, 592 n. 8, 78 S. Ct. 946, 948, 2 L.Ed.2d 996 (1958).

22. "[T]he civil portion of the Act incorporates, as a test of liability, the provisions of the criminal section as they were set out in § 5438 of the Revised Statutes of 1878 . . . ." *Rainwater v. United States,* 356 U.S. 590, 592, 78 S.Ct. 946, 948, 2 L.Ed.2d 996 (1958).

altered and codified form into 18 U.S.C. § 287 and 18 U.S.C. § 1001.[23] *Id.* at 228 n. 1, 88 S.Ct. 959. The civil provisions of R.S. § 3490 have also been codified in 31 U.S.C. § 231. *United States v. Neifert-White Co., supra* at 228 n. 1, 88 S. Ct. 959; *see Rainwater v. United States, supra* at 592 n. 8, 78 S.Ct. 946.

This peculiar statutory genealogy lends support to the Government's contention that cases brought under the civil branch of the False Claims Act are relevant to the interpretation of the criminal branches insofar as the civil cases rely upon incorporated criminal provisions. *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 (1943) establishes the utility and correctness of this contention. *Hess* was a civil action brought by an informer on behalf of the Government pursuant to R.S. §§ 3490–3493 (31 U.S.C. §§ 231–234). *Id.* at 539, 63 S.Ct. 379. The Supreme Court found that the civil action was grounded on the clause of section 5438 which prohibited the knowing presentation to the Government of false, fictitious, or fraudulent claims. *Id.* at 540 n. 2, 63 S.Ct. 379.[24] Thus, the Court's opinion construed language virtually identical to the wording of 18 U. S.C. § 287, the section 5438 descendant, which is presently under consideration. The defendants in *Hess* were electrical contractors who had participated in a collusive bidding scheme resulting in the submission of one preordained low bid and a remainder of higher estimates. *Id.* at 539 n. 1, 63 S.Ct. 379. A central issue in the case, resolved affirmatively by the Supreme Court, was whether the United States could have been defrauded where the defendants' contracts were with local municipalities although a substantial portion of their remuneration came from the United States. *Id.* at 541, 63 S.Ct. 379. In the course of resolving that issue, the Court rejected the narrow interpretation of section 5438 which the appellate court had employed in reversing the trial court's finding that the Government had been defrauded.[25] Conceding that section 5438 required careful scrutiny due to its criminal nature, the Court concluded that the statute should still be given "the fair meaning of its intendment." *Id.* at 542, 63 S.Ct. at 383. In the case of *Hess* and his co-defendants, the Court recognized that the contracts and payments were actually in the name of local authorities. However, it pointed out that the local disbursements depended upon monthly estimates for payment which were filed by defendants on Federal Public Works Administration (P. W.A.) forms and submitted for approval by federal authorities. The Court found these facts sufficient to constitute a fraud under section 5438 which went beyond the underlying fraudulent bids to touch their downstream payment claim consequences:

> "The government's money would never have been placed in the joint fund for payment to respondents had its agents known the bids were collusive. By their conduct, the respondents thus caused the government to pay claims of the local sponsors in order that they might in turn pay respondents under contracts found to have been executed as the result of the fraudulent bidding. *This fraud did not spend itself with the execution of the contract. Its taint entered into*

23. Prior to this present codification, an intermediate phase saw the codification of section 5438 as 18 U.S.C. §§ 80, 83. *See United States ex rel. Marcus v. Hess*, 317 U.S. 537, 540 n. 2, 63 S.Ct. 379, 87 L.Ed. 443 (1943). In 1940, section 80 was divided into two parts. Its prohibition of false claims became section 287 while its ban on false statements became 18 U.S.C. § 1001. *See United States v. Johnson*, 284 F.Supp. 273, 278 (W.D.Mo.1968).

24. "We think the conduct of these respondents comes well within the prohibition of the statute, which includes 'every person who . . . causes to be presented, for payment . . . any claim upon or against the Government of the United States . . . knowing such claim to be . . . fraudulent.'" 317 U.S. at 542, 63 S.Ct. at 383.

25. *See, U. S. ex rel Marcus v. Hess*, 127 F. 2d 233, 236–37 (3d Cir. 1942).

*every swollen estimate which was the basic cause for payment of every dollar paid by the P.W.A. into the joint fund for the benefit of respondents. The initial fraudulent action and every step thereafter taken pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded."* 317 U.S. at 543–44, 63 S.Ct. at 384. [emphasis supplied]

This reasoning does not recognize the distinction urged by defendant Winchester between fraudulent bids on contracts and the claims for payment under the awarded contracts which inevitably follow. *See United States v. Veneziale*, 268 F.2d 504, 506 (3d Cir. 1959) (claim grounded in fraud where fraudulent misrepresentation induced government to assume obligation); *United States v. Rohleder*, 157 F.2d 126 (3d Cir. 1946) (recovery of civil penalties under sections 3490, 5438 on contracts obtained through collusive bidding scheme).

Moreover, the cases cited by the defendant in an attempt to undercut the prosecution's interpretation of the Civil False Claims Act are clearly distinguishable and of little precedential value. One, *United States ex rel. Brensilber v. Bausch & Lomb Optical Co.*, 131 F.2d 545 (2d Cir. 1942), was decided prior to the Supreme Court's opinion in *Hess*. Its narrow construction of the Civil False Claims Act is in obvious contradiction to the "fair meaning of its intendment" philosophy enunciated by the Supreme Court. In addition, the *Brensilber* court itself specifically conceded "that if the claimant has once procured a contract by fraud, any claims he may thereafter present are 'fraudulent,' whether or not they fall within its terms." 131 F.2d at 546. The Court then went on to find that the defendant had not been a party to any deceit in the procurement of its contract and that, therefore, the defendant had perpetrated no fraud in its contract bidding despite the fact that it had apparently secured an unlawful monopoly in its market. *Id.* at 546–47. *United States ex rel. Weinstein v. Bressler*, 160 F.2d 403 (2d Cir. 1947), also cited by the defendant, is similarly inapplicable to the instant case. It is true that the *Bressler* court found no fraud or misrepresentation in the collusive bidding activities of the defendants. However, this holding is not surprising in light of the Court's finding that "the government officials were kept cognizant of and in fact fostered the noncompetitive bidding arrangement." *Id.* at 405.

█ Nor do the cases support the defendant's argument that there can be no offense where, as here, there is no allegation that "Kelleher was not entitled to file a claim, nor that the amounts he sought in the claims were in excess of what he should have received, nor that he did not perform the work for which he was seeking to be paid." Docket No. 7 at 3.[26] The statutory scheme has been construed "to permit recovery of a forfeiture . . . without actual damage being proven." *United States v. Rohleder*, 157 F.2d 126, 129 (3d Cir. 1946). *See United States v. Rainwater*, 244 F.2d 27, 28 (8th Cir. 1957), *aff'd*, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958). *See generally Rex Trailer Co. v. United States*, 350 U.S. 148, 153 & n. 5, 76 S.Ct. 219, 100 L.Ed. 149 (1956) (recovery possible where damages from fraud difficult or impossible to ascertain). Even where the Government withholds payment upon discovery of a fraud and thereby precludes the incursion of actual damages, the flat monetary penalty prescribed by the civil stat-

---

**26.** Defendant also decries the fact that the Government's interpretation of section 287 would prevent a successful bidder under a fraudulent bidding scheme from presenting claims for work which he had actually performed. Docket No. 7 at 3. The Court does not agree with the defense contention that this result represents an unjust enrichment contrary to Congress' intent since this presumes a Congressional solicitude for participants in fraudulent bidding schemes which is not reflected in the cases or the statutes.

ute for violation of section 5438 may be recovered. *United States v. Rohleder, supra* at 129; *United States ex rel. Marcus v. Hess,* 41 F.Supp. 197, 205 (W.D. Pa.1941), aff'd, 317 U.S. 537, 552, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Thus, the defendant's argument that a claim cannot be fraudulent "by implication" in the absence of chicanery associated with the claim itself is unsupported by the prevailing interpretation of the False Claims Act.

Furthermore, the cases urged by the defendant in support of its materiality argument shed no new light upon the meaning of section 287. One, *Paritem Singh Poonian v. United States,* 294 F. 2d 74 (9th Cir. 1961) was decided on a technicality concerning 18 U.S.C. § 1001's prohibition of the making of false statements. The Court found that the income which the defendant had allegedly understated was not his own and that a violation of section 1001 was therefore legally impossible. *Id.* at 76. Similarly, the defendants in *United States v. Diogo,* 320 F.2d 898 (2d Cir. 1963) had their convictions for making false representations under section 1001 overturned when it became clear to the appellate court that their malefaction had not been in any false representation to immigration authorities concerning their married state, but rather in their concealment of the scheme which had motivated the marriage. *Id.* at 905. The holding of the Court makes clear that an indictment charging the defendants with a violation of the concealment branch of section 1001 would have been valid. *Id.*

Finally, while this Court is cognizant of the strictures which operate in the construction of criminal statutes, the present construction of section 287 does not violate those strictures or constitute

a new departure from its historical use and interpretation:

"In the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil. See *e. g., United States ex rel. Marcus v. Hess,* 317 U.S. 537, 63 S.Ct. 379, 88 L.Ed. 443 (1943)." *United States v. Neifert-White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 961, 19 L.Ed.2d 1061 (1968) (discussing statutory predecessor of present False Claims Act).

*See Rainwater v. United States,* 356 U.S. 590, 592, 78 S.Ct. 946, 2 L.Ed.2d 996 (1958); *United States v. Downey,* 257 F. 366, 368 (D.R.I.1919); *Dimmick v. United States,* 116 F. 825, 828 (9th Cir. 1902), *cert. denied,* 189 U.S. 509, 23 S. Ct. 850, 47 L.Ed. 923 (1903); *United States v. Coggin,* 3 F. 492, 495 (E.D.Wis. 1880). See also *Rex Trailer Co. v. United States,* 350 U.S. 148, 153, 76 S.Ct. 219, 100 L.Ed. 149 (1966).

Therefore, defendant's motion to dismiss Counts 40 through 58 will be denied.

*C. Defendant's Motion to Dismiss Counts 97 Through 129*

Defendant's "Motion to Dismiss Counts 97 Through 129" is grounded differently than the dismissal motion filed with respect to Counts 40 through 58. Counts 97 through 129 assert violations of 18 U.S.C. § 1010 in that defendant Winchester submitted purchase orders to HUD representing that they were "proper for payment, which representation was false as the defendant then and there well knew . . . ." Docket No. 1 at 30.[27] The present mo-

27. Count 97 reads in full as follows:
"On or about April 22, 1971, in the Judicial District of Delaware, HENRY MC COMB WINCHESTER, JR., did for the purpose of influencing the action of the Department of Housing and Urban Development, willfully and knowingly make, pass, utter, and publish, and caused to be made, passed, uttered and published, a

false statement knowing the same to be false, that is, a representation in a purchase order and payment authorization, FHA Form 2542, submitted to such Department for payment to Parkview Construction Company, of One Thousand, Nine Hundred, Ninety Dollars ($1,990), Purchase Order Number 9999, which represented that said purchase order and pay-

tion challenges the sufficiency of the indictment in that it "fails to apprise the defendant of what he must be prepared to meet," Defendant's Reply Memorandum, Docket No. 28 at 1. Specifically the defendant argues that the FHA forms in question:

"contain an abundance of information and state numerous facts any one of which the grand jury might have found to have been false. For example, the indictment does not state whether the payment sought was too much, whether the work was not performed, whether the payment was to be made to the wrong person." *Id.* at 2.

The law in this District clearly requires that an indictment's adequacy be measured by

"Whether it contains the elements of the offense intended to be charged, *whether it sufficiently apprises the defendant of what he must be prepared to meet,* and in the event that subsequent proceedings are brought against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction. . . . ." *United States v. Little,* 317 F.Supp. 1308, 1310 (D.Del.1970) (emphasis supplied); *accord, United States v. Manetti,* 323 F.Supp. 683, 687–88 (D. Del.1971); *United States v. Borland,* 309 F.Supp. 280, 286 (D.Del.1970); *United States v. Wolfson,* 294 F.Supp. 267, 272 (D.Del.1968). See *Hamling v. United States,* 418 U.S. 87, 117–118, 94 S.Ct. 2887, 41 L.Ed.2d 590; *Russell v. United States,* 369 U.S. 749, 763, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962).

The "sufficient appraisal" requirement is two-edged in that it enables the defendant to prepare a defense to the counts' specific allegations, and, conversely, prevents the prosecution from making "a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment . . . ." *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L. Ed.2d 240 (1962). Such prevention is crucial since a defendant may not be convicted "on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." *Id.* at 770, 82 S.Ct. at 1050; *see United States v. Little,* 317 F.Supp. 1308, 1311 (D.Del.1970). In *United States v. Little, supra,* this Court was compelled to dismiss an information alleging willful refusal to answer " '*certain questions on schedules submitted to him* in connection with the 1970 Decennial Census. . . .' " 317 F.Supp. at 1309. It was found that Fed.R.Crim. P. 7(c)'s requirement of a "plain, concise and definite written statement of the essential facts constituting the offense charged . . ." was not met where the specific questions or schedules which the defendant failed to answer were not identified. *Id.* at 1310. In reaching this result, the Court rejected the Government's argument that a bill of particulars could supply any information lacking in the information itself, noting that "a bill of particulars is not a part of an indictment or information and it cannot validate a defective one. It can neither add to nor subtract from an information or indictment nor change the crime charged." *Id.* at 1311.

The present matter bears a striking similarity to *Little.* While the instant Counts may contain all necessary elements of the offense charged and may relate with specificity the particular documents involved, they do not identify the alleged falsity with which the grand jury was concerned. It is not enough to argue, as the Government does, that the grand jury's allegation of falsity specifi-

ment authorization was proper for payment, which representation was false as the defendant then and there well knew, in violation of Title 18, United States Code, Section 1010."

Counts 98 through 129 incorporate the al-

legations contained in Count 97 with variations in the dates of the offenses, the contractors involved, the dollar amounts requested in the purchase orders, and the identifying numbers of the purchase orders themselves.

cally referenced defendant's certification of the correctness and propriety for payment of the purchase orders involved. Absent a further refinement of the grand jury's allegation, the prosecutor would be free to pick and choose among numerous possible falsities which might belie the defendant's certification, while the defendant, cloaked in a veil of presumptive innocence, would be wholly uncertain as to the exact nature of the charge upon which he was to be tried. Moreover, the certainty which a prosecutor's bill of particulars might provide would not constitute a legally proper substitute for a definite statement concerning what the grand jury had charged. *See United States v. Silverman*, 430 F.2d 106, 110 (2d Cir. 1970) (specificity in indictment necessary to prevent usurpation of grand jury's power by court and prosecutor); and cases cited *supra.*

None of the cases cited by the Government in opposition to defendant's motion are persuasive that the indictment's Counts are sufficiently specific to apprise the defendant of what the grand jury actually found. In *Cohen v. United States*, 178 F.2d 558 (6th Cir. 1949), the indictment alleged a violation of a predecessor statute of 18 U.S.C. § 1010 by charging that the "document was false in that the signatures were obtained by fraud and misrepresentation, and none of the signers intended to apply for an advance of credit." 178 F.2d 590. What is lacking in the instant case is what was present in *Cohen*—an actual specification of why the defendant's representation was false.

*Van Liew v. United States*, 321 F.2d 664 (5th Cir. 1963), another case relied upon by the Government, is virtually dispositive of the instant issue in a manner contrary to that sought by the Government. There the Court found counts of an indictment insufficient where no specification was made of exactly what substance defendant had illegally substi-

tuted for a "valuable constituent" otherwise present in his food product. The Court stated that, "With the infinite variety of foods now manufactured and processed, the indictment must specify what the 'valuable constituent' is and then charge what 'substance has been substituted * * * therefor.'" *Id.* at 670–71. This language does not seem supportive of the Government's present assertion that the counts in question need not spell out the specific falsity underlying the false statement charges.

As a final response to the spectre of uncertainty which the defendant has raised, the Government asserts that, "A review of the indictment as a whole indicates that the policy of preventing usurpation of power by a court or a prosecutor is clearly satisfied." Docket No. 20 at 7. The assertion of policy-fulfillment rests upon the fact that various other counts of the indictment provide additional information concerning the nature of the purchase orders underlying Counts 97 through 129. This response misses the point. The question here touches upon constitutional strictures of the most fundamental nature,[28] and cannot be shunted aside by suggestions that account be taken of the "big picture" presented by the over-all indictment. While the Rules permit a grand jury to make incorporations by reference to other counts of an indictment, they make no provision for incorporation by prosecutorial assertion or judicial assumption. *See* Fed.R.Crim.P. 7(c)(1). If the grand jury had meant to incorporate the allegations or facts of the indictment's other counts, it could have done so. The Court and the prosecution may not. Therefore, defendant's motion to dismiss Counts 97 through 129 of the indictment will be granted.

### D. *Disclosure of Grand Jury Proceedings*

Defendant Winchester has also filed a motion pursuant to Fed.R.Crim.P. 6(e)[29]

---

28. *See Russell v. United States*, 369 U.S. 749, 770–71, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Silverman*, 430 F. 2d 106, 110 (2d Cir. 1970).

29. Docket No. 11, Motion of Defendant Winchester for the Disclosure of Prosecutor's Instructions to the Grand Jury and of Record of Grand Jury Vote, and for Dismissal of Indictment.

seeking disclosure of various matters concerning the Grand Jury proceedings which resulted in the indictment in this case.[30] One part of his motion seeks discovery or records of the prosecutor's statements and instructions to the grand jury. In the absence of transcripts or recordations, the defendant asks that secondary evidence such as testimony of the prosecutor himself be adduced to determine the contents of his comments to the Grand Jury concerning the nature of the indictment's charges, the law applicable to them, and the procedure by which the charges were to be considered and voted upon.

In support of his motion, the defendant has raised questions based upon the grand jury's perceived inability to legitimately return the superseding indictment within thirty-three days of the return of the original indictment. The defendant characterizes the modifications, eliminations, and additions which distinguish the superseding indictment from its predecessor as "lawyer's" changes and argues that they are "not of the type the grand jury would make on its own without specific directions from the prosecutor." Docket No. 11 at 3. The defendant further argues that the proper grand jury process was in some way "short-circuited" to enable "such a voluminous indictment [to be] returned in such a short time." Finally, the defendant asserts that the questions which he raises concerning the superseding indictment must be resolved by examining the prosecutor's instructions to the grand jury. The examination envisioned by

defendant would assertedly aid in determining whether the grand jury actually read or had read to it the entire indictment—or whether it voted the indictment simply on the basis of the prosecution's summary and description of its contents.

 Proceedings before a grand jury are generally accorded a strong presumption of regularity. 8 J. Moore, *Federal Practice* ¶ 6.05 at 6–53. The deductive reasoning employed by defendant in his effort to ferret out flaws in the grand jury proceedings relies upon baseless assumptions concerning the abilities of the grand jurors and the nature of the changes in the new indictment. The facile conclusions so engendered are more appropriately found in a Conan Doyle novel than a motion pursuant to Fed.R.Crim.P. 6(e). That rule requires that a particularized need be demonstrated before otherwise secret grand jury matters are revealed. *United States v. English*, 501 F.2d 1254, 1257 (7th Cir. 1974) (disclosure committed to discretion of trial judge: defendant must show particularized need); *United States v. Perkins*, 383 F.Supp. 922, 929, 930 (N.D.Ohio 1974) (superseding indictment regular on its face and particularized need not shown); *United States v. Manetti*, 323 F.Supp. 683, 694 (D.Del.1971) (must show particularized need outweighing desirability of secrecy); *United States v. Wolfson*, 294 F.Supp. 267, 271–72 (D.Del.1968) (must be more than "hunch"). Assertions based on vague allegations of unspecified "lawyer's changes" and con-

---

30. Fed.R.Crim.P. 6(e) provides that:
 "(e) Secrecy of Proceedings and Disclosure. Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the re-

quest of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury. No obligation of secrecy may be imposed upon any person except in accordance with this rule. The court may direct that an indictment shall be kept secret until the defendant is in custody or has given bail, and in that event the clerk shall seal the indictment and no person shall disclose the finding of the indictment except when necessary for the issuance and execution of a warrant or summons."

jectures concerning temporal probabilities are insufficiently particularized under the Rule to warrant a speculative inquiry into the genesis of an indictment which appears regular on its face. *See United States v. Messitte*, 324 F.Supp. 334, 337 (S.D.N.Y.1971). *See generally, United States v. Budzanoski*, 462 F.2d 443, 454 (3d Cir. 1972), *cert. denied*, 409 U.S. 949, 93 S.Ct. 271, 34 L.Ed.2d 220 (1972) ; *United States v. Slawik*, 408 F.Supp. 190, 201 (D.Del. 1975). Therefore, the defendant's request for disclosure of the prosecutor's instructions to the grand jury will be denied.

■ The defendant additionally moves pursuant to Fed.R.Crim.P. 6(c)[31] for an order requiring disclosure of the record of the grand jury's vote. He bases this motion on the premise that "each count of the indictment can be valid . . . only if the grand jury took a separate vote on whether or not to indict him on each count," Docket No. 11 at 6. The literal wording of Fed.R.Crim.P. 6(f) requires only that the indictment —rather than each of its individual counts—"be found only upon the concurrence of 12 or more jurors," and the cases bear out this interpretation. *See United States v. Perkins*, 383 F.Supp. 922, 930 (N.D.Ohio 1974) ; *United States v. Bally Mfg. Co.*, 345 F.Supp. 410, 421 (E.D.La.1972). See also *United States v. Zirpolo*, 288 F.Supp. 993, 1014–15 (D.N.J.1968), *reversed on other grounds*, 450 F.2d 424 (3d Cir. 1971). Since the ground urged in support of defendant's request for an order disclosing the voting record is without legal basis, there is no reason for such an order to be entered and the request will be denied.

E. *Discovery Relating to Government Witnesses*

■ The final matter before the Court is defendant's "Motion For Discovery and Inspection." Docket No. 10. Pursuant to Section 3(d) of our Local Plan under Fed.R.Crim.P. 50(b), and at the Court's specific urging, the parties have informally resolved all matters raised in the motion "with the exception of requests concerning witness lists and witness statements (Requests Numbered 3, 5 and 6). These requests ask that the Government provide to the defendant:

"3. A written list of the names and addresses of all witnesses the Government intends to call in the presentation of the case-in-chief together with any record of prior felony conviction of any such witnesses for the Government.

. . . . . . .

"5. A written list of the names and addresses of all persons who the Government knows to have knowledge of the matters alleged in the indictment, or who have been interviewed by the Government agents in connection with the case.

"6. All statements transcribed, recorded or summarized, of persons interviewed by law enforcement personnel or other Government agents relating to any matter referred to in the indictment, including statements of: (a) persons whom the Government intends to call as witnesses; and (b) persons whom the Government does not intend to call as witnesses."

The Government has refused adamantly in its written reply to this motion, and on oral argument, to supply the above categories of information requested by defendant. It argues that such turnovers are not required by presently

---

31. Fed.R.Crim.P. 6(c) provides that:
"(c) Foreman and Deputy Foreman. The court shall appoint one of the jurors to be foreman and another to be deputy foreman. The foreman shall have power to administer oaths and affirmations and shall sign all indictments. He or another juror designated by him shall keep a rec-

ord of the number of jurors concurring in the finding of every indictment and shall file the record with the clerk of the court, but the record shall not be made public except on order of the court. During the absence of the foreman, the deputy foreman shall act as foreman.

effective rules or statutes, and further calls into question the independent power of the Court to order that such material be made available to the defense except in the manner and at the times provided for by the Jencks Act, 18 U.S.C. § 3500. The defendant also cannot point to any specific provisions which would require discovery of this type, but urges considerations of judicial economy and trial fairness in support of his requests. In addition, he argues that the Court does possess the power necessary to order the discovery requested.

As a general proposition, it cannot be disputed that defendant's discovery requests are beyond the scope of those normally granted pursuant to Fed.R. Crim.P. 16 or 18 U.S.C. § 3500 (the Jencks Act). *See United States v. Addonizio,* 451 F.2d 49, 64 (3d Cir.), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L. Ed.2d 812 (1972); *United States v. Whiteside,* 391 F.Supp. 1385, 1388–89 (D.Del.1975); *United States v. Manetti,* 323 F.Supp. 683, 696 (D.Del.1971); *United States v. Wolfson,* 294 F.Supp. 267, 277–78 (D.Del.1968). *See also, Government of Virgin Islands v. Lovell,* 410 F.2d 307 (3d Cir. 1969). However, federal courts in appropriate cases have gone beyond the literal limits of Rule 16 and the Jencks Act when expanded discovery was found necessary to ensure the fair and efficient administration of criminal justice. *See United States v. Jackson,* 508 F.2d 1001, 1006–07 (7th Cir. 1975); *United States v. Moceri,* 359 F.Supp. 431, 434, 439–40 (N.D.Ohio 1973); *United States v. Goldberg,* 336 F.Supp. 1, 2 (E.D.Pa.1971); *United States v. Leichtfuss,* 331 F.Supp. 723, 732–33 (N.D.Ill.1971).[32]

In view of the general length and complexity of the trials which the de-

fendant will face, and, specifically, the projected amount of Jencks Act material which his attorneys will be forced to assimilate during interruptions in the proceedings, it cannot be disputed the trial would be expedited by turning over said material at a reasonable time prior to trial. In this case, however, the Government's strenuous objections, and its representations concerning the harm which such disclosures might engender, compel the Court to decline to grant the motion.[33] *See United States v. Moceri, supra* at 435; *United States v. Goldberg, supra* at 2; *United States v. Leichtfuss, supra* at 733.

---

32. The failure of proposed Rule 16(a)(1)(E), requiring the turnover of witness lists, to gain inclusion in the Federal Rules finally passed by Congress sheds no light on the Court's inherent power to order such turnovers in particular cases.

33. The Court's refusal to order compliance with the defendant's discovery motion ren-

ders moot the "United States Motion for Discovery and Inspection," Docket No. 17, since that motion specifically requested that "the Court condition its Order of discovery as to any government production by requiring the defendant to permit the Government to inspect and copy" material which the defendant intends to produce at trial.